**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Katrina Ann TINGLE,
Defendant-Appellant.**

**No. 80–1704.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 9, 1981.

Decided Oct. 13, 1981.

John L. Cleary, San Diego, Cal., for defendant-appellant.

Roger W. Haines, Jr., Asst. U. S. Atty., argued, M. James Lorenz, U. S. Atty., Charles Gorder, Asst. U. S. Atty., on the brief, San Diego, Cal., for plaintiff-appellee.

Before PREGERSON and REINHARDT, Circuit Judges, and HARDY,* District Judge.

---

* Honorable Charles L. Hardy, District Judge, District of Arizona, sitting by designation.

REINHARDT, Circuit Judge.

Katrina Ann Tingle appeals her conviction of conspiracy to purloin and purloining funds from a federal credit union, in violation of 18 U.S.C. §§ 371, 657. Tingle argues that her confession, which supported the conviction, was involuntary.

## I

On May 21, 1980, Tingle, 21, was an employee of the San Diego Navy Federal Credit Union. Early that morning, Tim Hurley, an employee of the credit union, arrived for work and found Tingle bound and gagged in the back room of the office. The credit union safe was open, and all the money had been removed. Tingle told Hurley that she had been attacked by an unknown assailant who had tied her up and stolen the money from the safe.

Hurley called the local police who arrived and questioned Tingle. The Federal Bureau of Investigation (FBI) was notified of the "robbery." FBI Special Agents Sibley and Ayers arrived at the credit union, spoke to the local police officer, and escorted Tingle to their automobile parked in front of the credit union in order to speak with her privately.

Tingle sat in the back seat of the automobile with Sibley while Ayers sat in the front seat. The interrogation which followed lasted for approximately one hour. Tingle repeated to the special agents what she had told the local officer. Sibley gave Tingle a standard FBI Advice of Rights form and asked her to read it aloud. Tingle read the form, indicated that she understood her rights and was willing to answer questions, and signed the written waiver.

Sibley then accused Tingle of lying. He told her that he believed she and her boyfriend had staged the robbery. Tingle denied her involvement. At that point, both agents were firmly convinced that Tingle had staged the "robbery" because of what they viewed as its amateurish commission. Sibley began to explain to Tingle the advantages of cooperating in an effort to get

her to tell the truth. He enumerated the crimes of which she might be guilty. He told her that she faced a twenty year sentence for bank robbery, twenty-five years if it was armed robbery, five years for conspiracy, five years for lying to a federal agent, and an additional potential penalty of five years if Tingle were to lie to a grand jury.[1] Tingle repeatedly maintained her innocence.

Sibley explained that it would be in Tingle's best interest to cooperate. There was some discussion about Tingle's release on her own recognizance during court proceedings. Sibley stated that he would inform the prosecutor if Tingle were to cooperate, or would alternatively inform the prosecutor that she was "stubborn or hard-headed" if she refused. Sibley suggested that it was quite possible that he had been told by Tingle's boyfriend that she was the one responsible for the entire planning and execution of the staged robbery.

At the beginning of the interrogation Sibley had determined that Tingle was the mother of a two-year-old child. In an effort to obtain a confession, Sibley told her either that she *would* not see the child for a while if she went to prison or that she *might* not see the child for a while if she went to prison.[2] His purpose was to make it clear to her that she had "a lot at stake."

During Sibley's interrogation Tingle began to sob. She was noticeably shaking. She continued to cry for at least ten minutes. She confessed that for a period of two months her boyfriend and a friend of his had formulated a plan to stage the "robbery" of the credit union. Tingle stated that she had gone to work on the morning of May 31st and opened the safe. Her

boyfriend then arrived, bound Tingle to a chair, taped her eyes and mouth closed, took the money from the safe, and left.

Prior to trial, Tingle moved to suppress the confession on the ground that it was coerced. The district court denied the motion. On appeal, Tingle argues that the district court erred in admitting the confession. She also asserts that the evidence is insufficient to support her conviction.

## II

"[A] defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession ... [citation omitted] and even though there is ample evidence aside from the confession to support the conviction." *Jackson v. Denno*, 378 U.S. 368, 376, 84 S.Ct. 1774, 1780, 12 L.Ed.2d 908 (1964). The reasons for excluding a coerced confession were explained fully by the Court in *Jackson*. First, confessions obtained in a coercive manner are likely to be unreliable. More important, involuntary confessions are forbidden

> because of the "strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will," *Blackburn v. Alabama*, 361 U.S. 199, 206–207, [80 S.Ct. 274, 279–80, 4 L.Ed.2d 242] and because of "the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to

---

1. Upon conviction, Tingle was actually placed on probation and ordered to serve four months in a jail-type or treatment institution. She was given a three year sentence of imprisonment but execution of the remainder of the term was suspended.

2. Tingle testified that Sibley told her she would never see her son again. Ayers said it was possible that Sibley told her "you *won't* see your child for a while" if you go to prison. Ayers added that the reference to the child was intended to demonstrate to Tingle that she had

been left holding the bag. Sibley testified he told her "if you go to prison you *might not* see your child for a while." He added that in talking to her about the child he stated, "there's a lot at stake here." It does not matter whether the words used were "might not" or "won't," since in either case the intended effect, and the effect reasonably to be expected, was to cause Tingle to fear that she would not see her child for a long period if she did not cooperate.

be criminals as from the actual criminals themselves." *Spano v. New York*, 360 U.S. 315, 320–21 [79 S.Ct. 1202, 1205–6, 3 L.Ed.2d 1265].

*Jackson*, 378 U.S. at 386, 84 S.Ct. at 1785.

■ In order to be voluntary, a confession must be "the product of a rational intellect and a free will." *Blackburn v. Alabama*, 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960). The fifth amendment secures "the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty ... for such silence." *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964). Consequently, a confession "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Id.* at 7, 84 S.Ct. at 1493 (quoting *Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 186–87, 42 L.Ed. 568 (1897)).

■ A confession is involuntary whether coerced by physical intimidation or psychological pressure. *Townsend v. Sain*, 372 U.S. 293, 307, 83 S.Ct. 745, 754, 9 L.Ed.2d 770 (1963). Law enforcement conduct which renders a confession involuntary does not consist only of express threats so direct as to bludgeon a defendant into failure of the will. Subtle psychological coercion suffices as well, and at times more effectively, to overbear "a rational intellect and a free will." As the Supreme Court noted in *Malloy*, "[w]e have held inadmissible even a confession secured by so mild a whip as the refusal, under certain circumstances, to allow a suspect to call his wife until he confessed." 378 U.S. at 7, 84 S.Ct. at 1493 (citing *Haynes v. Washington*, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963)).

■ The government must prove that a confession is voluntary by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972). On appeal, we must "examine the entire record and make an independent determination of the ultimate issue of voluntariness." *Beckwith v. United States*, 425

U.S. 341, 348, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976) (quoting *Davis v. North Carolina*, 384 U.S. 737, 741–42, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966)).

## III

Tingle argues that her confession was involuntary because Sibley coerced her into confessing by threatening that she would not see her child for a long time if she did not cooperate and by warning of the long term of imprisonment which could be imposed. She also contends that it was improper for Sibley to promise to seek lenient treatment and early release for her if she did cooperate.

The record simply does not support Tingle's claim that Sibley made any improper promise or agreed to seek her early release. We must examine more closely, however, Tingle's contention that her confession was involuntary as a result of statements which caused her to fear that she would not see her child for a long time if she refused to cooperate.

In *Lynumn v. Illinois*, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963), the Supreme Court considered a confession that had been made

only after the police had told her that state financial aid for her infant children would be cut off, and her children taken from her, if she did not "cooperate." These threats were made while she was encircled in her apartment by three police officers and a twice convicted felon who had purportedly "set her up." There was no friend or adviser to whom she might turn. She had had no previous experience with the criminal law, and had no reason not to believe that the police had ample power to carry out their threats.

*Id.* at 534, 83 S.Ct. at 920. The Court concluded that the confession had been coerced. *Id.*

■ In *Lynumn*, the coercion consisted of the interrogators' express threat that the petitioner's children would be taken away from her if she did not cooperate. In this case, the threat is not as explicit nor as

extreme, but the coercive purpose and effect are indistinguishable from that in *Lynumn*. Agent Sibley recited a virtual litany of the maximum penalties for the crimes of which Tingle was suspected, totaling 40 years imprisonment. He expressly stated, in a manner that could only be interpreted in light of the lengthy sentences he had described, that Tingle would not see her two-year-old child "for a while." Referring specifically to her child, Sibley warned her that she had "a lot at stake." Sibley also told Tingle that it would be in her best interest to cooperate and that her cooperation would be communicated to the prosecutor. He also told her that if she failed to cooperate he would inform the prosecutor that she was "stubborn or hard-headed."

 We think it clear that the purpose and objective of the interrogation was to cause Tingle to fear that, if she failed to cooperate, she would not see her young child for a long time. We think it equally clear that such would be the conclusion which Tingle could reasonably be expected to draw from the agent's use of this technique. The relationship between parent and child embodies a primordial and fundamental value of our society. When law enforcement officers deliberately prey upon the maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit "cooperation," they exert the "improper influence" proscribed by *Malloy*. The warnings that a lengthy prison term could be imposed,[3] that Tingle had a lot at stake, that her cooperation would be communicated to the prosecutor,[4] that her failure to cooperate would be similarly communicated,[5] and that she might not see her two-year-old child for a while must be read together, as they were intended to be, and as they would reasonably be understood. Viewed in that light, Sibley's statements were patently coercive.[6]

In *United States v. McShane*, 462 F.2d 5 (9th Cir. 1972), we stated that "we can readily imagine that the psychological coercion generated by concern for a loved one could impair a suspect's capacity for self control, making his confession involuntary." *Id.* at 7. Although we held the confession in *McShane* voluntary, the circumstances surrounding Tingle's confession are distinguishable in every way from those there

---

**3.** We have not previously and do not here decide whether, under circumstances different from those present in the case before us, it is proper to inform a defendant of the maximum statutory penalties for the offenses of which he or she is suspected. We note that the Fifth Circuit has approved "telling the appellant in a noncoercive manner of the realistically expected penalties." *United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978) (detaining officer described both fifteen year maximum penalty and five to seven year penalty normally imposed).

**4.** Under some circumstances it is proper for an interrogating officer to represent to a suspect that his cooperation will be made known to the prosecutor. *United States v. Glasgow*, 451 F.2d 557, 558 (9th Cir. 1971). We have held that "this type of representation, *standing alone*, does not necessarily render a subsequent confession involuntary." *Id.* at 558 (emphasis added) (citations omitted). Here, the offer to inform the prosecutor of Tingle's cooperation was one of a series of representations made to Tingle. Consequently, we must consider the cumulative effect of the statements made in order to determine whether Tingle's confession was voluntary.

**5.** Although it is permissible for an interrogating officer to represent, under some circumstances, that the fact that the defendant cooperates will be communicated to the proper authorities, the same cannot be said of a representation that a defendant's failure to cooperate will be communicated to a prosecutor. Refusal to cooperate is every defendant's right under the fifth amendment. Under our adversary system of criminal justice, a defendant may not be made to suffer for his silence. Because there is no legitimate purpose for the statement that failure to cooperate will be reported and because its only apparent objective is to coerce, we disapprove the making of such representations.

**6.** We need not decide whether the statements served the identical purpose as the *Lynumn* statements, i.e., caused the mother to believe she would lose permanent custody of her offspring, although we note that such is certainly a possible effect of the statements made here. We base our holding that the confession was involuntary on the assumption that the statements caused Tingle to fear only that she would not see her child for a substantial period of time.

involved.[7] In *McShane*, the officers had a legitimate reason for bringing the defendant's girlfriend to the station house for questioning; Sibley had no legitimate purpose in warning Tingle that she would not see her child or in telling her that he intended to inform the prosecutor that she had refused to cooperate. In *McShane*, the defendant had no reason to believe that his confession would serve to protect his girlfriend, because he had been told that she was free to leave the station house prior to the time he confessed; Tingle had every reason to believe, from what she was told, that her confession would have a significant impact on her ability to see her child. Moreover, in *McShane* the court said that the record did not reflect that the defendant felt great psychological stress; here, the record does so reflect.

When we consider the totality of the circumstances, we conclude that the psychological coercion brought to bear upon Tingle produced her confession. We hold, therefore, that Tingle's confession was not "the product of a rational intellect and a free will" and was involuntary.[8]

■ Tingle argues in the alternative that she is not guilty of violating 18 U.S.C. § 657 because she did not take the money from the safe or possess that money at any time. Tingle is incorrect. All that is necessary for her to commit a conversion under 18 U.S.C. § 657 is that she exercise dominion and control over the money inconsistent with the credit union's rights. *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1027 (6th Cir. 1979); *Quaker Oats Co. v. McKibben*, 230 F.2d 652, 654 (9th Cir. 1956). Tingle exercised control over the money when

she opened the safe and left it open so that her boyfriend could remove the money.

■ For the same reason, Tingle's argument that she is not guilty of conspiracy to violate 18 U.S.C. § 657 is incorrect. She contends that the evidence does not show that the plan called for *her* to take any money from the safe or that *she* did. Such a showing is not necessary to support a conviction for conspiracy to violate 18 U.S.C. § 657. *Cf. United States v. Thompson*, 493 F.2d 305, 310 (9th Cir.), *cert. denied*, 419 U.S. 834, 95 S.Ct. 60, 42 L.Ed.2d 60 (1974).

The judgment of the district court is reversed and the case remanded for proceedings consistent with this opinion.

---

7. McShane was arrested in possession of firearms at the apartment of his girlfriend, Villareal. After McShane's arrest, Villareal was brought to the station house for questioning. There, she and McShane were allowed to speak privately, and Villareal asked McShane whether he was going to allow her to be implicated. When McShane offered to confess if the officers would permit Villareal to leave, an officer replied that Villareal was free to go at any time. McShane nevertheless confessed.

8. In the colloquy which preceded the district court's ruling as to voluntariness, the court

responded to Tingle's counsel's arguments concerning a number of the statements discussed herein. However, the district court made no response to counsel's argument as to the statements concerning her child, other than to note that counsel attributed Sibley's statement to Ayers and vice-versa. The court said only, "I think you are backwards, but it doesn't matter." Apparently the court believed the statements regarding Tingle's child to be of no particular significance. The district court's ruling was clearly erroneous.