# United States Court of Appeals
## For the First Circuit

No. 12-1016

UNITED STATES OF AMERICA,

Appellee,

v.

MICHAEL JACQUES,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Torruella, Circuit Judge,
Souter,* Associate Justice,
and Selya, Circuit Judge.

Brian J. Kelly, by appointment of the court, for appellant.
Randall E. Kromm, Assistant United States Attorney, with whom
Carmen M. Ortiz, United States Attorney, was on brief, for
appellee.

March 11, 2014

---

* Hon. David H. Souter, Associate Justice (Ret.) of the Supreme
Court of the United States, sitting by designation.

**TORRUELLA, Circuit Judge.** Following a seven-hour interrogation in which he confessed participating in the arson of an African-American church, Michael Jacques was convicted in federal court of conspiracy against civil rights, damage to religious real property, and the use of a fire to commit a felony. On appeal, Jacques argues that the district court erred in admitting his statements into evidence because agents obtained his confession through coercive means and in violation of his right to prompt presentment. For the reasons below, we affirm.

## I. Facts and Background

On the morning of November 5, 2008, hours after Barack Obama was elected to be the next President of the United States, the Macedonia Church of God in Christ in Springfield, Massachusetts, burned to the ground. Still in the middle of construction, the church was being built for a predominantly African-American congregation. It was approximately 75% complete at the time of the fire.

The National Response Team for the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) concluded that the fire was deliberately set and that gasoline had been used to ignite the building. It subsequently convened a joint task force with the Federal Bureau of Investigation (FBI), the Springfield Police Department, and the Massachusetts State Police (MSP) to investigate the incident. When a civilian witness notified investigators of

-2-

two men boasting about their involvement in the church arson, the task force homed in its investigation on Benjamin Haskell and Michael Jacques.

Soon after receiving the tip, law enforcement officials arranged to have the civilian witness introduce Haskell to undercover State Trooper Henot Rivera. Working under the name "José," Trooper Rivera made three controlled purchases of narcotics from Haskell, one of which turned out to be a fake bag of heroin. "José" then told Haskell that he could compensate for the botched drug deal by helping with a purported insurance scam -- specifically, by burning down a house in Springfield and an abandoned property in Holyoke, Massachusetts. On January 14, 2009, while driving to Holyoke to survey the alleged arson site, "José" encouraged Haskell to describe his credentials as an arsonist. In a recorded conversation, Haskell confided to Trooper Rivera that he and Jacques had committed the church arson in November. Armed with these statements, law enforcement officials intervened and transported Haskell to a police interview room, where he confessed to committing the church arson with the help of Jacques and two other individuals. Haskell agreed to cooperate in the continued investigation of the church fire.

The following evening, January 15, 2009, the task force coordinated a meeting between Haskell, Jacques, and Trooper Rivera, in which "José" invited Jacques to join the insurance scam. Both

in the presence of Trooper Rivera and during a private conversation with Haskell, Jacques made incriminating statements concerning his involvement in the church arson. Jacques's statements were caught on tape by the task force, which then detained Jacques and transported him to an interview room for questioning.

Jacques arrived at the MSP's offices in Springfield and was escorted by agents from the vehicle at 7:16 p.m. His questioning commenced at approximately 7:20 p.m., when he knowingly waived his Miranda rights. Jacques's interrogation lasted approximately six hours and thirty minutes and was videotaped in its entirety.

The interrogation was conducted primarily by State Trooper Michael Mazza, although FBI Special Agent Ian Smythe was present during the first hours and again toward the end of the questioning. Over the course of the interview, Mazza and Smythe employed various interrogation tactics from the "Reid technique."[1] They exaggerated the strength of the evidence against Jacques, misrepresented the involvement of high-profile federal agents in the case, minimized the magnitude of Jacques's alleged criminal conduct, interrupted Jacques's attempts to deny his guilt, and suggested that Jacques's continued resistance would subject him to more damning media coverage. Repeatedly, the agents informed

---

[1] The "Reid technique" is a method of interrogation pioneered by John E. Reid and Associates, aimed at extracting confessions and evaluating suspect credibility.

Jacques that an honest confession might lead to softer treatment by the prosecutor and the sentencing judge, while a failure to cooperate was likely to result in the maximum sentence. They also remarked on the failing health of Jacques's elderly father, suggesting that continued resistance might deprive Jacques of crucial years with his family.

Throughout the interview, Jacques was permitted to take bathroom, water, and cigarette breaks upon request. Having previously faced charges on several criminal matters, Jacques was also aware of his right to ask for the interrogation to cease, although at no point did he do so. He did, however, continue to deny his involvement in the fire throughout the interrogation, claiming that his incriminating statements to the undercover trooper were merely an attempt to make himself "look bigger."

At 1:17 a.m., just under six hours from the time Jacques's interrogation began and just over six hours from the time he was taken into custody, Mazza asked Jacques to "sign something for [him] real quick" and handed Jacques a waiver of his right to prompt presentment. Mazza read the document aloud and explained the requirement that a defendant must be arraigned within six hours of detention. When Jacques asked Mazza to clarify precisely what he was signing, Mazza replied that the document meant that "you don't want the questioning to stop and be brought to court or anything like that, that you're willing to still talk to me."

Jacques signed the document at roughly 1:20 a.m. Approximately half an hour later, Jacques took another cigarette break. When he returned to the interrogation room at around 1:45 a.m., Jacques admitted his involvement in the church arson. Jacques explained that he chose to confess because Mazza had "proved" the charges and "w[as] honest to me."

Jacques was arraigned later that morning. He was ultimately charged with conspiracy against civil rights in violation of 18 U.S.C. § 241, damage or destruction to religious real property in violation of 18 U.S.C. § 247(c), and use of a fire to commit a felony in violation of 18 U.S.C. § 844(h)(1).

Following his arraignment, Jacques moved to suppress the incriminating statements made in his confession. Jacques argued that the confession was involuntary because the agents' coercive tactics had overborne his will and that his waiver of his right of presentment was neither timely nor knowing under federal law. The district court took in abundant briefing and numerous days of testimony, during which Jacques testified, among other things, that he understood the nature of his right to presentment and waived that right to "have a chance to continue explaining" his innocence, "rather than going into court right away and being charged with a crime." The district court ultimately denied the motion to suppress. On April 14, 2011, Jacques was convicted by a jury of

all three charges.  On May 9, 2011, the district court issued a memorandum explaining its ruling on Jacques's motion to suppress.

Jacques now appeals to this court.

## II.  Discussion

In considering a challenge to a district court's denial of a motion to suppress, we review the court's legal conclusions de novo and its findings of fact for clear error.  United States v. Mejía, 600 F.3d 12, 17 (1st Cir. 2010).  The voluntariness of a defendant's confession is a question of law meriting de novo review.  United States v. Hughes, 640 F.3d 428, 438 (1st Cir. 2011).

## A.  Coercive Interrogation

The Fifth Amendment right against self-incrimination prohibits courts from admitting into evidence a defendant's involuntary confession.  Dickerson v. United States, 530 U.S. 428, 433 (2000).  In assessing whether a confession is voluntary, courts must inquire "whether the will of the defendant had been overborne so that the statement was not his free and voluntary act."  Bryant v. Vose, 785 F.2d 364, 367-68 (1st Cir. 1986) (quoting Procunier v. Atchley, 400 U.S. 446, 453 (1971)).  We determine the voluntary nature of the statements by considering "the totality of the circumstances, including both the nature of the police activity and the defendant's situation."  Hughes, 640 F.3d at 438.  Relevant considerations include the length and nature of the questioning,

promises or threats made by investigators, and any deprivation of the suspect's essential needs. Id. They also include the defendant's personal circumstances, including his age, education, intelligence, and mental condition, id., as well as his prior experience with the criminal justice system, see United States v. Jackson, 608 F.3d 100, 103 (1st Cir. 2010); United States v. Rojas-Tapia, 446 F.3d 1, 8 (1st Cir. 2006). A defendant's calm demeanor and the lucidity of his statements weigh in favor of finding his confession voluntary. Rojas-Tapia, 446 F.3d at 8.

Numerous facts in the record indicate that Jacques provided his confession knowingly and voluntarily. A defendant in multiple criminal matters in the past, Jacques was experienced with the justice system. Throughout the interrogation and his subsequent confession, Jacques remained calm and provided a level-headed account of his involvement in the arson. His decision to confess was not a sudden or immediate response to any of the agents' questions or threats, indicating the agents' coercive impact, but rather came after a cigarette break during which Jacques was relieved of all interrogation. Perhaps most importantly, Jacques himself explained his decision to confess based on his belief that Mazza had "proved" the allegations and had been "honest" with him.

In the face of this evidence, Jacques claims that Mazza and Smythe's coercive interrogation techniques overbore his will in

violation of the Fifth Amendment. We find that none of the allegedly coercive tactics identified by Jacques, either individually or together, suffice to show that Jacques's confession was involuntary.

### 1. Threats of Retaliation

It is well settled in the First Circuit that an officer does not impermissibly overbear a defendant's will by promising to bring the defendant's cooperation to the prosecutor's attention or by suggesting that cooperation may lead to more favorable treatment. See, e.g., United States v. Baldacchino, 762 F.2d 170, 179 (1st Cir. 1985); see also Jackson, 608 F.3d at 103. While the rules governing an agent's threats of harsher punishment in exchange for a defendant's failure to cooperate is less settled, this court has held that threats of retaliation are just one factor relevant to evaluating the voluntariness of a confession. United States v. Jackson, 918 F.2d 236, 242 (1st Cir. 1990) ("Congress and the courts have indicated that to determine voluntariness it is necessary to look at the totality of the circumstances, including any promises or threats made by police officers or the prosecution, in order to see whether the will of the accused was overborne."); see also United States v. Martin-Ramírez, No. CR-08-220-E, 2009 WL 928103, at *5 (D. Idaho Apr. 2, 2009) ("[I]f a defendant has had no previous experience with criminal law coupled with facts that she was threatened with adverse consequences for lack of cooperation

and had no friend or advisor during the time of confession, are factors that should be considered in determining whether a defendant's confession was voluntary."). Accordingly, federal courts considering the totality of the evidence have repeatedly found that an interrogator's threats of a harsher prison sentence if a defendant failed to cooperate did not suffice to overbear the defendant's will. See, e.g., United States v. Jenkins, 214 F. App'x 678, 680 (9th Cir. 2006) (finding that, "[i]n the absence of other coercive pressures," an agent's statements that "he would advise the prosecutor if William cooperated or if he refused to cooperate" "do not entail the conclusion that William's statements were involuntary"); United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir. 1990) (finding a confession voluntary where agents offered "threats of a long prison sentence if [the defendant] failed to cooperate," but no evidence showed that defendant was "especially susceptible to police pressure").

Jacques points to a series of Ninth Circuit cases suggesting that an agent's threats of retaliation automatically render an ensuing confession involuntary. See United States v. Casillas, 538 F. App'x 751, 751-52 (9th Cir. 2013) ("We have repeatedly found that a threat of harsher treatment renders any subsequent confession involuntary."); United States v. Harrison, 34 F.3d 886, 891-92 (9th Cir. 1994) ("[T]here are no circumstances in which law enforcement officers may suggest that a suspect's

-10-

exercise of the right to remain silent may result in harsher treatment by a court or prosecutor."); see also United States v. Melnikas, 929 F. Supp. 276, 281 (S.D. Ohio 1996) ("Threatening to inform the court or a prosecutor of a suspect's refusal to cooperate in order to elicit such cooperation violates an individual's Fifth Amendment right to remain silent and is clearly coercive."). This is not the prevailing rule in our circuit. Furthermore, even the Ninth Circuit has more recently qualified that its "disapprov[al] . . . of an interrogator's threats to tell the prosecutor about a defendant's refusal to cooperate . . . does not amount to a categorical rule." Jenkins, 214 F. App'x at 680 (citations omitted). In greater harmony with our own rule, the Ninth Circuit's cases holding that an agent's threats of retaliation violated the Fifth Amendment involved significant additional indicia of coercion. See, e.g., Harrison, 34 F.3d at 892 (finding a defendant's confession involuntary where the defendant "broke her silence only after the agent asked whether she thought it preferable if the judge were informed that she had cooperated or not cooperated," indicating a strong coercive impact); United States v. Tingle, 658 F.2d 1332, 1336 (9th Cir. 1981) (finding a defendant's confession involuntary where the agents threatened to communicate her lack of cooperation to the prosecutor and warned that defendant would not see her two-year old child "for a while").

-11-

In this case, there is no evidence suggesting that Mazza and Smythe's threats of a harsher sentence in exchange for Jacques's refusal to cooperate had any meaningful impact on Jacques's conduct during the interrogation. Unlike prior cases where agents' threatening or manipulative statements inspired demonstrable anxiety in the defendants, see, e.g., Tingle, 658 F.2d at 1334, Mazza and Smythe repeated their threats numerous times over the course of a six hour interrogation without any identifiable effect on Jacques. Similarly, unlike previous defendants who explicitly identified the threat of retaliation as their reasons for confessing, see, e.g., Harrison, 34 F.3d at 892, Jacques explained his decision to confess without reference to any of the agents' alleged threats. While these threats are certainly relevant to a determination of voluntariness, in light of the entire record they fail to establish that Jacques's will was overborne.

### 2. Preying on Family Feeling

This circuit recognizes that psychological duress may suffice to overbear a defendant's will so as to make subsequent statements inadmissible. Jackson, 608 F.3d at 102-03. Accordingly, statements that a defendant's refusal to cooperate may lead to an extended separation from his or her loved ones may contribute to a finding that the defendant's confession was coerced. See, e.g., Lynumn v. Illinois, 372 U.S. 528, 534 (1963) (finding the

defendant's confession involuntary where "the petitioner's oral confession was made only after the police had told her that state financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate,'" among other factors); Tingle, 658 F.2d at 1336 (finding confession involuntary where agents made defendant "fear that, if she failed to cooperate, she would not see her young child for a long time").

However, the mere fact that a defendant is placed "under some psychological pressure" by agents does not necessarily render a confession involuntary. United States v. Jobin, 535 F.2d 154, 159 (1st Cir. 1976). In Jackson, for example, this circuit refused to find that a defendant's confession was involuntary on the basis of police officers' threats to charge his sister with a crime if he did not cooperate. 918 F.2d at 242. Distinguishing Lynumn and Tingle, we noted that those earlier cases involved "mothers . . . coerced by threats that their children would be taken from them" and included evidence that the defendants "may have been more susceptible to psychological coercion" than other suspects. Id.; cf. Tingle, 658 F.2d at 1336 (emphasizing the "primordial and fundamental" relationship of a mother to her child). Absent evidence that the defendant in Jackson had "an especially close relationship" with his sister or "was unusually susceptible to psychological coercion on that account or any other," we found that the "totality of the circumstances" failed to suggest that his will

-13-

was overborne.  <u>Jackson</u>, 918 F.2d at 242; <u>see also</u> <u>United States</u> v. <u>Charlton</u>, 565 F.2d 86, 89 (6th Cir. 1977) (finding that the defendant's confession was voluntary despite agents' threats to arrest his son, of whom defendant "was highly protective," because a desire to protect a relative "does not, in our judgment, render his confession involuntary or necessitate a finding that he was coerced").

In this case, Agent Mazza made a single reference to Jacques's father's health several hours before Jacques decided to confess.  Jacques's demeanor at the time of his confession did not manifest any notable psychological or emotional anxiety in response to Mazza's statement, nor does the record include any indicia that Jacques was particularly susceptible to manipulation.  Under the totality of the circumstances, the record does not suggest that Mazza's appeal to Jacques's family feeling had a coercive impact on the defendant's confession.

### 3.  Other Claims

Finally, Jacques claims that Mazza and Smythe overbore his will through their use of the "Reid technique," including exaggerating their evidence and minimizing the gravity of his suspected offense, in obtaining a confession.

Extreme forms of deception or chicanery by the police may be sufficient to render a confession involuntary.  <u>Hughes</u>, 640 F.3d at 439.  Nevertheless, "the use of chicanery does not automatically

undermine the voluntariness of a confession." Id. This court has consistently recognized that "some degree of deception . . . during the questioning of a suspect is permissible." Id.; see also United States v. Boskic, 545 F.3d 69, 79 (1st Cir. 2008) (reaffirming "the proposition . . . that 'confessions procured by deceits have been held voluntary in a number of situations'") (quoting United States v. Byram, 145 F.3d 405, 408 (1st Cir. 1998)).

Specifically, "a confession is not considered coerced merely because the police misrepresented to a suspect the strength of the evidence against him." Clanton v. Cooper, 129 F.3d 1147, 1158 (10th Cir. 1997); see also Frazier v. Cupp, 394 U.S. 731, 739 (1969) (finding that the police's "misrepresent[ations]" of a co-defendant's alleged incriminating statements were, "while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible."); Holland v. McGinnis, 963 F.2d 1044, 1051 (7th Cir. 1992) (finding "the fact that the officer misrepresented . . . the strength of the evidence" to be "one factor to consider among the totality of circumstances in determining voluntariness"); Green v. Scully, 850 F.2d 894, 903 (2d Cir. 1988) (finding police officer's "assert[ion] that he already had a strong case against petitioner" insufficient to render the ensuing confession involuntary). As the Seventh Circuit has noted, "[o]f the numerous varieties of police trickery, . . . a lie that

-15-

relates to a suspect's connection to the crime is the least likely to render a confession involuntary." Holland, 963 F.2d at 1051.

In this case, the agents' statements exaggerating the quality of their evidence, minimizing the gravity of Jacques's offense, and emphasizing the negative media attention that would attend Jacques's trial all fall safely within the realm of the permissible "chicanery" sanctioned by this and other courts. Jacques points to no federal authority supporting a finding of an involuntary confession under similar circumstances. The one case cited by Jacques, Commonwealth. v. Baye, 967 N.E.2d 1120 (Mass. 2012), is a state court decision that is neither binding on this court nor directly analogous on the facts. See id. at 1130 (noting in support of its finding that the agents "mischaracterized the law of murder, felony-murder, and accident" and "dissuaded" the defendant when he asked to consult an attorney). Considered in the full circumstances of this case, Mazza and Smythe's interrogative tactics did not amount to coercion in violation of Jacques's Fifth Amendment rights.

## B. Right to Prompt Presentment

Jacques further challenges the admissibility of his confession on the ground that his interrogation violated his right to prompt presentment.

Under the Federal Rules of Criminal Procedure, a defendant who has been arrested within the United States is

entitled to be brought "without unnecessary delay before a magistrate judge."  Fed. R. Crim. P. 5(a)(1)(A).  The right of speedy presentment not only checks the likelihood of coercive questioning, but also avoids "all the evil implications of secret interrogation of persons accused of crime."  Corley v. United States, 556 U.S. 303, 307 (2009) (quoting McNabb v. United States, 318 U.S. 332, 344 (1943)).  Presentment is "the point at which the judge is required to take several key steps to foreclose Government overreaching: informing the defendant of the charges against him, his right to remain silent, his right to counsel, the availability of bail, and any right to a preliminary hearing; giving the defendant a chance to consult with counsel; and deciding between detention or release."  Id. at 320.  To protect this right, the McNabb-Mallory rule established by the Supreme Court stipulates that confessions made during a period of detention that violates the prompt presentment requirement of Rule 5(a) are generally inadmissible in federal courts.  Id. at 309; United States v. Alvarez-Sanchez, 511 U.S. 350, 354 (1994).

Following the Supreme Court's articulation of the McNabb-Mallory exclusionary rule, Congress enacted 18 U.S.C. § 3501 to create a safe harbor period for certain voluntary confessions.  See Corley, 556 U.S. at 309  (discussing legislative history and intent of § 3501).  With respect to Rule 5(a)'s requirement of speedy presentment, § 3501(c) provides that "a confession . . .

shall not be inadmissible solely because of delay in bringing such person before a magistrate judge or other officer . . . if . . . such confession was made or given by such person within six hours immediately following his arrest or other detention." 18 U.S.C. § 3501(c). The section further provides that its six-hour cut-off "shall not apply in any case in which the delay in bringing such person before such magistrate judge . . . is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate judge or other officer." Id.

Jacques signed a waiver of his right to prompt presentment at 1:20 a.m., four minutes past § 3501(c)'s safe harbor period. He now contends that, because his waiver was untimely under § 3501(c), his subsequent confession is inadmissible under McNabb-Mallory. Specifically, Jacques insists that the delay cannot be deemed "reasonable" because § 3501(c) recognizes an exception to its six-hour window only for delays caused by transportation or travel considerations, neither of which apply to this case.[2]

Jacques's argument misconstrues the significance of § 3501(c)'s safe harbor. Section 3501(c) does not provide that all

_____

[2]   The parties additionally dispute whether Jacques was within "federal custody" during his interrogation so as to trigger the application of 18 U.S.C. § 3501(c). Because we can resolve Jacques's challenge based on the reasonableness of the four-minute delay, we need not reach this issue.

-18-

confessions gathered beyond its six-hour window automatically or even presumptively violate Rule 5(a)'s right of presentment "without unnecessary delay." Fed. R. Crim. P. 5(a)(1)(A). Rather, it sets up a two-part inquiry for that right. First, the section creates a safe-harbor for voluntary statements that are received either within six hours of a defendant's detention, or within a longer period deemed reasonable in light of travel or transportation difficulties. Corley, 556 U.S. at 322 ("If the confession came within that period, it is admissible . . . ."). Where a voluntary confession falls beyond the safe harbor, § 3501(c) then requires a court to determine whether the delay was nevertheless reasonable or necessary under McNabb-Mallory. Id. ("If the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary under the McNabb-Mallory cases, and if it was, the confession is to be suppressed."); United States v. McDowell, 687 F.3d 904, 909 (7th Cir. 2012) ("A confession given outside the six-hour period is also admissible under § 3501(c) if the court finds the confession was voluntary and the delay in presentment was reasonable.").

The right of prompt presentment does not create a "mechanical or automatic" duty for officers to arraign defendants upon arrest. Mallory v. United States, 354 U.S. 449, 455 (1957). Rather, "[c]ircumstances may justify a brief delay" where that

delay is based on reasonable or legitimate grounds. Id. A delay "is unreasonable and unnecessary when it is 'of a nature to give opportunity for the extraction of a confession.'" United States v. García-Hernández, 569 F.3d 1100, 1106 (9th Cir. 2009) (quoting Mallory, 354 U.S. at 455). However, a delay may be reasonable if caused by administrative concerns, such as the unavailability of a magistrate following an arrest, see, e.g., id. at 1106; see also United States v. Carter, 484 F. App'x 449, 457-58 (11th Cir. 2012), cert. denied, 133 S. Ct. 994 (2013), or by a shortage of personnel, García-Hernández, 569 F.3d at 1106; United States v. Salamanca, 990 F.2d 629, 633 (D.C. Cir. 1993). Furthermore, a purely de minimis delay past § 3501(c)'s six-hour limitation may not necessarily raise any procedural concerns. See United States v. Oropeza-Flores, 230 F.3d 1368 (9th Cir. 2000).

Based on the circumstances of this case, Agent Mazza's brief delay in acquiring Jacques's waiver of his right to presentment was not "unreasonable and unnecessary" so as to merit suppression of his statements under McNabb-Mallory.[3] Assuming that

---

[3] The government also suggests that § 3501(c)'s six-hour limitation on an interrogation prior to presentment does not apply to a defendant's waiver. By the government's theory, while the prosecution may not introduce any statements made between the termination of the six-hour safe harbor and the defendant's waiver of his right to presentment, it can rely on any statements made following a knowing waiver, no matter when the waiver occurred. This argument would drain the right of prompt presentment of any substance. A necessary extension of the government's theory is that federal agents could interrogate a defendant for six hours and then, instead of bringing him before a magistrate, detain him for

Jacques's detention began the moment he was escorted from the vehicle at 7:16 p.m., Mazza presented Jacques with a waiver one minute past the six-hour window and Jacques signed that waiver four minutes past that window. The extremely minor margin by which Mazza exceeded the safe harbor and his prompt break in questioning until Jacques signed the waiver suggest that Mazza did not purposefully ignore § 3501(c) for the improper goal of continuing an unrestricted interrogation. Nor, considering the unavailability of a magistrate judge at the time of Jacques's interrogation, do the circumstances suggest that Mazza willfully defaulted on his

---

hours or days longer in the hopes that he will eventually choose to waive presentment and continue the interrogation. Such a practice would avoid all the established procedural benefits of presentment, including "informing the defendant of the charges against him, his right to remain silent, his right to counsel, the availability of bail, and any right to a preliminary hearing." Corley, 556 U.S. at 320.

duty to take Jacques for prompt arraignment.[4]  More likely, they suggest a minor and ultimately harmless miscalculation of the time.

Finally, Jacques argues that his waiver is invalid because it was not obtained knowingly, intelligently, and voluntarily.  See McDowell, 687 F.3d at 910 (noting that a waiver of prompt presentment must be knowing and voluntary).  Specifically, Jacques insists that Agent Mazza misrepresented the nature of his Rule 5(a) rights by suggesting that the waiver would help Jacques by forestalling charges, while it in fact benefitted the investigators by allowing them to continue interrogation.  This argument finds no support in the record.  The transcript of the interrogation reveals that Mazza accurately explained the contours of Jacques's right to presentment, including the opportunity to come before a judge, to have counsel appointed him, and to be admitted to bail.  Jacques's testimony at his suppression hearing

---

[4]  Jacques insists that the unavailability of a magistrate cannot be used to justify prolonging an interrogation.  Taken to its extreme, he notes, the practice would allow agents to circumvent § 3501(c) at any time by arresting suspects at night or over weekends.  See United States v. Middleton, 344 F.2d 78, 82 (2d Cir. 1965) ("[T]he unavailability of a Commissioner does not license the police to continue their interrogation through the night.").  Unlike Middleton, however, this situation is not one where agents took the unavailability of a magistrate as an excuse to "continue their interrogation through the night."  Rather, it is one where agents properly informed Jacques of his right to terminate the interrogation and presented him with a formal waiver when their six-hour safe harbor expired.  In consideration of the record, the agents' minor miscalculation does not constitute an unnecessary and unreasonable delay in violation of Jacques's right to prompt presentment.

-22-

confirmed that, as a veteran of the criminal justice system, he was familiar with the right of presentment. Furthermore, Jacques admitted that he chose to sign the waiver to "have a chance to continue explaining" his innocence in order to dissuade the agents from filing formal charges against him. Based on Jacques's testimony, the district court did not err in concluding that Jacques's waiver was knowing, intelligent, and voluntary.

### III. Conclusion

For the foregoing reasons, the decision of the district court is affirmed.

**Affirmed.**