# United States Court of Appeals
## For the First Circuit

No. 14-1393

UNITED STATES OF AMERICA,

Appellee,

v.

DANIEL HUFSTETLER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Howard, Lipez and Barron,
Circuit Judges.

Joshua L. Solomon, with whom Pollack Solomon Duffy LLP was on brief, for appellant.
Seth R. Aframe, Assistant United States Attorney, with whom John P. Kacavas, United States Attorney, was on brief, for appellee.

March 20, 2015

**HOWARD, <u>Circuit Judge</u>.** Appellant-Defendant Daniel Hufstetler challenges his conviction for robbing a federal credit union, 18 U.S.C. § 2113(a), arguing that he was coerced into confessing to that crime in violation of his Fifth Amendment rights. At the time of Hufstetler's interrogation, his girlfriend was also in police custody for the robbery. A significant chunk of Hufstetler's interview thus dealt with the impact that his cooperation would have on her prospects for release. Before trial, Hufstetler filed two motions to suppress, each anchored on the theory that the invocation of his girlfriend in this manner constituted an improper threat or promise. The district court twice rejected that argument. Because we conclude that the officers did not act impermissibly, and that Hufstetler confessed through his own volition, we affirm.

**I.**

In November 2011, the New Hampshire State Police and the FBI were investigating a bank robbery at the Guardian Angel Credit Union in Berlin, New Hampshire. Relatively quickly, they homed in on Hufstetler and his girlfriend Sheena Craig as the primary suspects. After arresting Hufstetler and Craig, three law enforcement officers -- FBI Special Agent Laura Hanlon, Berlin

-2-

Police Corporal Luc Poulin, and Berlin Detective Rich Plourde -- interrogated Hufstetler.[1]

At that time, the officers had already painted a detailed picture of the crime. They knew that the two suspects were in financial trouble; they had conducted a search of Hufstetler's home and car which led them to clothing and shoes that matched those worn by the robber in the bank's surveillance video; they had obtained pictures from the bank video that showed Hufstetler; they had met with witnesses who saw Hufstetler and Craig both sitting in a car and driving around the bank before the robbery; and, they knew that Hufstetler was sitting across from the bank immediately before the crime. They had also interviewed Craig prior to their discussion with Hufstetler, at which time she provided them with the precise routes that the two took on the day of the robbery.

At several points throughout Hufstetler's interrogation, the officers referred to this evidence and indicated that they believed he was guilty. They also noted that the purpose of the interrogation was, in part, to determine Craig's precise role. Though they knew that she drove him to the bank, they knew little else about her culpability. For instance, Special Agent Hanlon said, "This is your opportunity to explain to us what her role is," and, "she's down there [being held by officers] based on what we

_____

[1] We take note that the officers began the interrogation by providing Hufstetler with his <u>Miranda</u> rights. They also tape recorded the entire interview.

-3-

have right now." Corporal Poulin also asked, "[W]as she there on her own accord or did she not know what was going on?" Later on, Corporal Poulin cut to the chase and stated, "I know it was you. I already know it was you . . . My only intention up here Daniel, is to figure out [Craig's] involvement."

Intersecting with that line of inquiry was the officers' recognition that Hufstetler was concerned for his significant other. After Hufstetler repeatedly expressed that concern, his interrogators tried to explain the situation in terms that would resonate with him; that is, they explained how his cooperation could or could not assist Craig. For instance, Special Agent Hanlon said, "You should feel like a real heel because you put her in this position . . . Our job is to find [the person responsible for the robbery] and arrest him . . . We feel we've done that job." At another point, Special Agent Hanlon also stated, "you should be upset because you care for her and this is quite disruptive to her life." Corporal Poulin summed it up for Hufstetler by saying, "There's obviously different outcomes for [Craig], depending on what it is in the details that we're looking for here." Critically, the officers consistently told Hufstetler that he needed to tell the truth and that they lacked the authority to make any guarantee or promise in exchange for his cooperation.

For Hufstetler's part, he appeared to be enjoying the process and wanted it to continue. He noted, "I don't get what

you, you're trying to speed up the process . . . Why are you so quick on the draw? . . . Don't you know every minute I sit in here is a little more funner than down there?" At other times, he steered the conversation back to Craig in a blatant attempt to secure a deal for her; he obfuscated his answers; or, he simply ignored the officers' questions. Both his tone and cadence reflected his aim at any given point; e.g., he spoke quickly and somewhat combatively when attempting to secure a deal for Craig, but was slow and relaxed when trying to elongate the interview.

At the end of this two hour and fifteen minute conversation, Hufstetler seemed satisfied that his confession would save Craig from criminal charges. He asked, "so once you get your guy, so to speak, for that . . . are you still gonna keep digging like super deep." After Detective Plourde assured Hufstetler that "I'm not gonna go from here . . . and just try to rip every part of your life and everybody involved with you," Hufstetler confessed. During that admission, he took full responsibility for the robbery.

In March 2012, a federal grand jury indicted Hufstetler for this crime. Prior to trial, his counsel moved to suppress the confession. The district court, albeit with limited discussion, rejected the motion after finding the confession to be "entirely voluntary." Roughly one week before trial, Hufstetler tried again with an analogous pro se motion. The district court again denied

it.  A jury subsequently found Hufstetler guilty on the charged crime, and the court sentenced him to 180 months in prison.

This timely, single-issue appeal followed.

## II.

We review the denial of a motion to suppress an allegedly involuntary confession de novo.  United States v. Hughes, 640 F.3d 428, 438 (1st Cir. 2011).  Any findings of fact, of which there were none here, are ordinarily reviewed for clear error.  United States v. Jacques, 744 F.3d 804, 809.

## III.

It is well established that the government may not use an involuntary confession against a defendant at trial.  See Dickerson v. United States, 530 U.S. 428, 434 (2000).  A coerced confession is improper because it is not "the product of a rational intellect and a free will."  Lynumn v. Illinois, 372 U.S. 528, 534 (1963)(internal quotation marks and citation omitted).  The introduction of such evidence violates an individual's due process rights and thus requires reversal regardless of the sufficiency of the remaining record.  United States v. Jackson, 918 F.2d 236, 241 (1st Cir. 1990).  When the voluntariness of a confession is challenged, the government must prove by a preponderance of the evidence that it was properly elicited.  Id.

To make a voluntariness determination, we engage in a "totality of the circumstances" inquiry.  Hughes, 640 F.3d at 438.

This requires us to balance the officers' tactics with the unique background of each individual suspect.  Id.  The lynchpin of our analysis is whether the government's conduct overtook the will of the defendant.  See Jackson, 918 F.2d at 242.

Hufstetler's case turns on whether the officers' references to his girlfriend during the interrogation were inappropriate and, if so, whether such statements overpowered his will.  As he sees it, his interrogators immediately sensed his concern for Craig and then repeatedly referenced her incarceration in order to force his hand.  It was only after the officers successfully convinced Hufstetler that Craig's freedom hinged on his willingness to talk, he says, that he finally confessed.  He thus insists that the officers infringed upon his constitutional rights.

Over time, there have been several developments in the law applicable to addressing the propriety of utilizing a suspect's family member during an interrogation, as Hufstetler alleges occurred here.  Admittedly, the applicability of the decision in any one case to another can be difficult given the fact-intensive nature of the totality-of-the-circumstances inquiry.  As a body though, the cases do provide guideposts to aid us in determining whether police conduct in this context crosses the line.  We thus begin by laying out a mosaic of cases on this topic before plotting Hufstetler's plea in that panoply of law.

**i.**

One cluster of cases implies that the use of a family member uniquely tugs at a suspect's emotions and thus can have an undue impact. Particularly notable here are two Supreme Court decisions. The first, Lynumn, involved officers informing a defendant that her failure to cooperate would result in her losing financial aid for, and custody of, her children. 372 U.S. at 534. The Court noted that the defendant had no reason to question the officers' capacity to carry out those threats. Id. Accordingly, the court deemed the tactics improper and ordered the confession suppressed.

A few months later in Haynes v. Washington, 373 U.S. 503 (1963), the Court reiterated this point. There, interviewing officers repeatedly told a suspect that he would be unable to call or see his wife until he wrote out a confession. 373 U.S. at 507. Those threats occurred over a number of days and the defendant "gave in only after consistent denials of his requests to call his wife, and the conditioning of such outside contact upon his accession to police demands." Id. at 514. The Court deemed this improper and, when weighed against the defendant's susceptibility to coercive tactics, found the confession to be involuntary.

Hufstetler points us to a number of cases from the Ninth Circuit which he believes best capture the import of those Supreme Court opinions. The first is United States v. Tingle, 658 F.2d

-8-

1332 (9th Cir. 1981).  In that case, the Ninth Circuit evaluated an interrogation in which the suspect was told that she had "a lot at stake" with respect to her child.  658 F.2d at 1334.  The court used the occasion to broadly state that it is impermissible to "deliberately prey upon the maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit cooperation."  Id. at 1336 (internal quotation marks omitted).

In 2011, that court restated this proposition in Brown v. Horell, 644 F.3d 969 (9th Cir. 2011) -- a case that Hufstetler largely clings to here.  The Ninth Circuit reviewed an interrogation during which an officer noted that the suspect's ability to see or be with his child was entirely contingent on his cooperation with the police.  644 F.3d at 981.  They "expressly conditioned [the suspect's] ability to be with his child on his compliance with her questioning."  Id.  Although the petitioner's ultimate claims were denied under relevant habeas standards, the court still classified such threats as coercive.  Id. at 981-82.

At a minimum, these cases illustrate that we must be on alert when an officer utilizes a family member as a tool during an interrogation.  Nonetheless, cases from this circuit provide examples of situations where the discussion of a family member was deemed acceptable.  The parties emphasize two.

The first is United States v. Jackson, 918 F.2d 236 (1st Cir. 1990).  There, a defendant was arrested for gun and drug

offenses but only admitted to possessing the drugs. In an effort to entice the suspect to talk, the investigating officer informed him that his sister was under arrest for the gun violation, and thus his confession could assist her. 918 F.2d at 241. On appeal, Jackson argued that the use of the sister in that way was unduly coercive, but we concluded that the statement was neither a direct threat nor promise. Id. at 241-42. Moreover, we found that "there [was] no evidence that an especially close relationship existed between Jackson and his sister, or that Jackson was unusually susceptible to psychological coercion on that account or any other." Id. at 242. Accordingly, we affirmed the district court's decision that the confession was voluntary.

Recently, we reached a similar result in United States v. Jacques, 744 F.3d 804 (1st Cir. 2014). In that case, interrogating officers remarked "on the failing health of Jacques's elderly father, suggesting that continued resistance might deprive Jacques of crucial years with his family." 744 F.3d at 808. In response to an involuntariness challenge, we stated that "statements that a defendant's refusal to cooperate may lead to an extended separation from his or her loved ones may contribute to a finding that the defendant's confession was coerced . . . [h]owever, the mere fact that a defendant is placed under some psychological pressure by agents does not necessarily render a confession involuntary." Id. at 811 (internal quotation marks and citation omitted). We

ultimately concluded that the subsequent confession was voluntary because there was only a single reference to the family member, the suspect's demeanor during the interrogation did not manifest any notable psychological or emotional anxiety, and there was no evidence that he was particularly susceptible to coercion. Id. at 811; see also Cooper v. Bergeron, ___ F.3d ___ , 2015 WL 627070 at *13 (1st Cir. Feb. 13, 2015).

Thus, while Lynumn and its progeny counsel us to be particularly cognizant of the risk of coercion when reviewing interrogations where officers invoke references to a family member, our cases also emphasize that discussion of a family member, on its own, is not per se coercive. Instead, we must closely examine the specific manner in which the officer discussed the relative and weigh such references against the defendant's susceptibility to coercion.

**ii.**

In this case, we balance the officers' conduct with Hufstetler's susceptibility to coercion by addressing each consideration in turn.

**a.**

When evaluating the propriety of police tactics we consider "the totality of the circumstances," which may include the "length and nature of the questioning," the existence of any explicit or implicit threats, and any deprivation of a suspect's

-11-

essential needs.  <u>Hughes</u>, 640 F.3d at 438.  A promise or threat need not be explicit, but can also result from "[s]ubtle psychological coercion."  <u>Tingle</u>, 658 F.2d at 1335.

Hufstetler accuses the officers of making improper threats or promises.  To flesh out this argument, he cites portions of the transcript which, in his view, show the officers conditioning Craig's release on his willingness to confess.  Most notably, he quotes: "I certainly don't want to see those kids be without their mother;" "[T]here's obviously different outcomes for [Craig], depending on what it is in the details;" and, "[Y]ou can save her a buck by saying that you didn't tell her what you were gonna go do, but you're not doing that."  He thus believes that the officers deliberately preyed on his emotions to force a confession from him.[2]

After carefully reviewing the transcript and listening to the interrogation, we can discern no improper threat or promise. At the outset, we note that the officers had probable cause to hold

---

[2] Hufstetler also briefly points to statements that "[y]ou not saying anything is hurting her.  [y]ou're willing to sell her down the river, so be it," and "you'll miss an opportunity to have any kind of input on the outcome for her, and that's all on you."  He says that these comments violated his Fifth Amendment right to remain silent.  As will be discussed though, the officers merely described the position that Hufstetler and Craig were in without embellishing or distorting that difficult reality; they were not, however, conditioning either individual's freedom on a willingness to talk.  Further, the officers made clear that Hufstetler had the right to remain silent and could stop answering questions at any point.  Accordingly, this argument lacks merit.

Craig. In such a circumstance where the referenced relative is both a family member and a co-suspect, probable cause for holding that individual helps to place the officers' statements in context. Without more, an officer's truthful description of the family member's predicament is permissible since it merely constitutes an attempt to both accurately depict the situation to the suspect and to elicit more information about the family member's culpability. See, e.g., United States v. Jones, 32 F.3d 1512, 1517 (11th Cir. 1994) (finding a confession voluntary where agents had probable cause to suspect Jones's girlfriend, informed him that she would be prosecuted if she was involved, and "never told [him] that his girlfriend would not be prosecuted if he cooperated"); Allen v. McCotter, 804 F.2d 1362, 1363 (5th Cir. 1986) (denying an involuntariness claim where officers told the suspect that "because his wife was directly involved in the robbery, charges could be filed against her"); see also Thompson v. Haley, 255 F.3d 1292, 1296-97 (11th Cir. 2001); United States v. Kime, 99 F.3d 870, 879-80 (8th Cir. 1996); cf. United States v. Ortiz, 943 F. Supp. 2d 447, 456-58 (S.D.N.Y. 2013) (where an officer's threat to arrest a suspect's elderly aunt without any probable cause was deemed improper); United States v. Andrews, 847 F. Supp. 2d 236, 249-50 (D. Mass. 2012) (finding police conduct impermissible where officers sought to make a suspect believe that they would arrest his elderly mother for the alleged crime).

In context, it is difficult to view the officers' actions, in their totality, as improper. The officers' statements were undoubtedly difficult for Hufstetler to swallow, and the officers were clearly aware that Hufstetler was in a rough spot. But, they never lied, exaggerated the situation, or conditioned either individual's release on Hufstetler's willingness to speak. Instead, they told Hufstetler that Craig was a suspect and unless new information came to light to discount her culpability she would continue to be criminally liable. We take no issue with the officers' utilization of this indisputably true fact to both gain more information about Craig and to elicit more intelligence about Hufstetler's own actions. Given Craig's putative criminality, such statements simply do not align with the kind of inappropriate threats made in the Lynumn line of cases.

Equally relevant, the officers also emphasized that they could not, and would not, promise Hufstetler anything in exchange for his confession. For example, Special Agent Hanlon stated bluntly that "I don't have the power or the authority . . . nor does the detective, to go down and un-arrest [Craig] right now." Detective Plourde reiterated that by saying "I can't make you any promises before you tell me what actually happened." Thus, even if the references to Craig were impolitic, an objectively reasonable individual in Hufstetler's shoes could not have construed the statements as constituting a promise or threat. Cf. United States

-14-

v. LeBrun, 363 F.3d 715, 725 (8th Cir. 2004) (framing the issue as whether "a reasonable person would view the Agents' statements as a promise").

Ultimately, this record reflects little more than officers, faced with two criminal suspects, attempting to sift out each individual's role. Though Craig was undoubtedly significant to Hufstetler, the officers never utilized her in a manner which would have converted their acceptable references into impermissible ones. For that reason, the police conduct here falls far closer to the Jackson and Jacques line of cases than the blatant and improper discussions that occurred in Lynumn, Haynes, and the like.

### b.

In addition to considering the officers' actions, we must examine whether Hufstetler was susceptible to the allegedly illegal police conduct. Jackson, 918 F.2d at 242. Here, we evaluate the defendant's "age, education, intelligence, and mental condition," and any "prior experience with the criminal justice system." Jacques, 744 F.3d at 809.

Hufstetler again cites to the transcript to support his contention that he would not have confessed but for the officers' implication that Craig's freedom hinged on him doing so. He notes that he finally confessed after "Detective Plourde's assurance that the way to 'get [her] out of here' was for Mr. Hufstetler to 'tell us what happened.'"

-15-

Focusing solely on the dynamics of this specific interrogation, we are hard-pressed to find support for the conclusion that Hufstetler was susceptible to coercion or that his will was actually overcome. See, e.g., United States v. Larry, 126 F.3d 1077, 1079 (8th Cir. 1997) (examining remarks made to officers during an interrogation and concluding, based on those statements, that the defendant voluntarily confessed). Throughout the interview, Hufstetler actively tried to extend the interrogation, attempted to avoid questions, and even appeared to be having some fun with the officers. As previously noted, he made remarks such as "I don't get what you, you're trying to speed up the process," and "Why are you so quick on the draw?" The recording of the interrogation renders his ploys unmistakable.

Further, our review of the recording makes plain that Hufstetler was steering the conversation in an effort to secure a deal for Craig; he was fully cognizant of what he was doing throughout the entire process. At several points during the interrogation, the officers proceeded to a different topic, but Hufstetler pivoted the conversation back to Craig. He was not shy about making his intent clear, making statements such as, "It's like how does she physically get out of here? . . . where's the guarantee at? What's the deal?" In fact, and contrary to Hufstetler's interpretation, the transcript immediately preceding his confession reflects the voluntary decision-making process that

-16-

he undertook; it was only when he was satisfied that he had accomplished his goal that he began to discuss the robbery. Such self-awareness and negotiation tactics are simply not hallmarks of an individual susceptible to, or who has been overtaken by, any coercive techniques.[3]

Ultimately, the transcript and recording are devoid of evidence that Hufstetler lacked sufficient control over his own choices. In that respect, he stands in the same shoes as the defendants in Jackson and Jacques, and his challenge must be resolved the same way.

**IV.**

The dynamics of the interrogation in this case lead us to conclude that Hufstetler voluntarily chose to confess. Accordingly, we **affirm**.

---

[3] Hufstetler briefly argues that the officers had reason to believe that his mental health was compromised and that he was particularly susceptible to coercive tactics. To support this argument, he cites portions of the transcript and then references competency issues that emerged throughout the pendency of his criminal case. As the government persuasively rebuts though, no evidence at the time of the interrogation would have put a reasonable officer on notice that Hufstetler suffered from any such mental condition. This case thus does not involve a situation where the officers were "dealing with a suspect whose compromised mental state" was known to them. See Hughes, 640 F.3d at 440.