526 So.2d 260 (1988)
STATE of Louisiana, Appellee,
v.
Michael HAHN, Appellant.
No. 19,562-KA.
Court of Appeal of Louisiana, Second Circuit.
May 4, 1988.
Rehearing Denied May 26, 1988.
*261 Indigent Defender Office by John M. Lawrence, Richard E. Hiller, Shreveport, for appellant.
William J. Guste, Jr., Atty. Gen., Paul J. Carmouche, Dist. Atty., Powell A. Layton, Tommy J. Johnson, Asst. Dist. Attys., for appellee.
Before MARVIN, JASPER E. JONES and SEXTON, JJ.
SEXTON, Judge.
The defendant, Michael Jordan Hahn, was arrested on August 8, 1986 following the shooting death of his wife in the South Central Bell parking lot in Shreveport, Louisiana. The defendant was indicted for second degree murder with a firearm. He pled not guilty and not guilty by reason of insanity. After a bench trial, the defendant was convicted of manslaughter committed with a firearm. He was sentenced to twenty-one years at hard labor for manslaughter and an additional two years at hard labor for illegal use of a firearm in the manslaughter offense. LSA-R.S. 14:95.2. We affirm.

FACTS
On August 8, 1986, at about 11:25 a.m., the defendant called his wife's place of employment, South Central Bell in Shreveport, Louisiana, and asked to speak to his wife Brenda. Three days before this call, the couple had separated when Brenda took the couple's three children and moved into her parents' house. The defendant called his wife to talk about a reconciliation. Not able to talk at that time, Brenda attempted to return the call a few minutes later but no one answered.
About 1:00 p.m., the defendant appeared at the South Central Bell office to wait for his wife to get off work. He had in his possession his father's loaded .38 caliber pistol. In statements to the police and to psychiatrists, he claimed that he wanted to talk to his wife about reconciliation and that he brought the gun only to insure that she would talk to him. He caught her attention as she was leaving the building and she came over to where he was standing in the parking lot. They argued when she refused to come home with him. The defendant then showed her the gun and asked her to get into the car. Brenda screamed and ran. The defendant fired several times, hitting her once in the chest and once in the back, resulting in her *262 death. The defendant then shot himself in the face. The bullet entered through the left cheek and exited behind the left ear. This wound was not life-threatening, and the defendant remained conscious, alert, and talkative at the scene. As precautionary measures, the paramedics administered oxygen, put mast trousers on him to stabilize his blood pressure in the event that it dropped, and started an intravenous supply of Ringer's lactate.
The defendant was transported to Schumpert Medical Center where he was examined by Dr. John M. Cobb, the emergency room physician. He observed that the defendant was alert and not in shock. He administered a booster dose of tetanus toxoid and ordered x-rays of his facial bones.
While the defendant was in the emergency room, Detective Don Norwood took two statements from the defendant. The first statement was unrecorded and was taken about 20-25 minutes after the shooting. Detective Norwood read Miranda rights to the defendant and then initialed a Miranda card which the defendant signed. On the basis of that statement, Detective Norwood decided to arrest the defendant for second degree murder and so advised him. After again reading the Miranda rights to the defendant and initialing the second rights card which the defendant signed, Detective Norwood took a second statement from the defendant which was recorded.

ASSIGNMENTS OF ERROR NOS. 1 AND 2
By these assignments, the defendant asserts that the trial court erred in 1) denying the defendant's pretrial motions to suppress statements that he made to police during his treatment in a hospital emergency room and 2) admitting into evidence at trial the statement made at the hospital.[1]
The defendant argues that when he gave the recorded statement while he was being treated at Schumpert "he did not have the emotional, intellectual, nor physical ability to understand and waive his constitutional rights due to the fact that he was suffering not only from a gunshot wound to the head, but also from a mental abnormality which affected his ability to comprehend the situation."
According to the transcript of that statement, the defendant explained the circumstances of his marital differences and why he had taken the gun from his father's house. He said that he had been out of work, that he and his wife were in debt, and that Brenda had "had enough of it" and left. He explained that he went to her place of employment to talk to her about reconciling. He stated that he did not intend to use the gun. He had shown it to her just to persuade her to get in his car with him and talk to him. Unfortunately, upon seeing the gun, Brenda screamed and ran. It was at that point that the defendant thought to himself, "now everything is gonna be exposed, she's gonna tell everyone about the gun and everything and I just went, I don't know, just I don't know, just went nuts ... and I just shot her and then I I [sic] was sorry I did it so I shot myself." The statement was consistent with the original oral statement that he gave to the police and with the statements he made to witnesses and medical personnel at the scene.
At the proceeding on the motion to suppress, Detective Norwood, Dr. Cobb, and Elizabeth Gorman, a registered nurse who witnessed the emergency room interviews, testified concerning the circumstances existing at the time of the statement.
*263 They testified that the defendant was conscious, that he never indicated that he was in pain or in need of medication, and that he did not appear to be under the influence of drugs or alcohol. The emergency medical personnel who treated the defendant at the scene did not give him any medication, although they did start an IV of Ringer's lactate. Dr. Cobb, the physician who treated the defendant at Schumpert, testified that the defendant did not go into shock as a result of the wound and that he was alert and cooperative. Dr. Cobb did not administer any pain medication. He did administer a booster dose of tetanus toxoid, but he testified that this medication would not affect one's ability to understand what was said to him.
Detective Norwood testified that he informed the defendant of his Miranda rights, that the defendant never indicated that he did not understand what Detective Norwood was telling him, and that he did not ask for a lawyer. During the questioning, he was not under the influence of any fear, duress, or intimidation.
Nurse Gorman corroborated the testimony of Dr. Cobb and Detective Norwood.
The defendant's expert, Dr. Mark Vigen, a psychologist, administered a series of tests to the defendant in October of 1986. (R. 104) According to Dr. Vigen, the tests revealed that the defendant had an I.Q. of 77, a borderline range of measured intelligence, and that he had chronic brain dysfunction of a mild degree. Brain dysfunction is the inability of the brain to perform certain tasks: to process sensory information, to concentrate, to remember, to handle a multitude of problems at one time and switch back and forth, and to solve problems.
In regard to the defendant's ability to understand and waive his constitutional rights, Dr. Vigen stated at the suppression hearing that the personality tests revealed that the defendant had a "diminished capacity to understand the effects of what he is doing, especially in a highly emotionally charged situation that is unpredictable and new for him, and is specifically without structure." Despite this assertion, Dr. Vigen was unable to state categorically that the defendant could not understand the consequences of his waiver of his rights.[2]
Dr. George Seiden, a psychiatrist on the Sanity Commission examining the defendant, found, however, that the defendant did not have a chronic brain dysfunction. Dr. Ann Arretteig, the other psychiatrist on the Sanity Commission, also found that the defendant "showed no signs of major psychiatric disorder."
In denying the defendant's motion to suppress the statement made at the hospital, the trial court determined that neither the defendant's physical condition nor his low intelligence prevented him from understanding his constitutional rights and waiving them. The trial court failed to find that the defendant suffered from a mental defect that rendered him unable to understand and waive his constitutional rights.
Before a confession can be introduced into evidence, the state has the burden of affirmatively proving that it was free and voluntary and not made under the influence of fear, duress, menaces, threats, inducements or promises. LSA-R.S. 15:451; LSA-C.Cr.P. Art. 703 (D).
The question of voluntariness of a confession, including a determination of the defendant's state of mind, must be resolved from the facts and circumstances of the particular case.... The trial judge must consider the "totality of the circumstances" in arriving at his finding that the confession is admissible....
State v. Serrato, 424 So.2d 214, 221 (La. 1982) (citations omitted). When the issue is whether the defendant's level of intellectual disability precluded him from understanding his rights and the consequences of waiving them, much weight is accorded the trial judge's finding. State v. Lefevre, 419 So.2d 862 (La.1982). His conclusions on the credibility and weight of testimony *264 relating to the voluntariness of a confession for the purpose of admissibility will not be overturned unless they are not supported by the evidence. State v. Terracina, 430 So.2d 64 (La.1983); State v. Jackson, 414 So.2d 310 (La.1982); State v. Wilson, 469 So.2d 1087 (La.App. 2d Cir.1985), writ denied, 475 So.2d 778 (La.1985).
The fact that the defendant was suffering from a gunshot wound does not mean that he cannot give a voluntary statement. One who has suffered physical harm can still be competent to give a free and voluntary confession. State v. Smith, 409 So.2d 271 (La.1982); State v. Smith, 407 So.2d 652 (La.1981). A diminished mental or intellectual capacity likewise does not of itself vitiate the ability to knowingly and intelligently waive constitutional rights and make a free and voluntary confession. State v. Benoit, 440 So.2d 129 (La.1983). "The critical factor is whether the defendant was able to understand the rights explained to him and voluntarily give a statement." Benoit, supra, at 131.
We conclude on the basis of the record evidence which we have summarized herein that the trial court did not err in finding a knowing and intelligent waiver of constitutional rights and a free and voluntary statement, even in light of defendant's wound and his alleged diminished intellectual capacity. This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 3
The defendant asserts that the trial court erred in finding him guilty of manslaughter as the verdict was contrary to the law and evidence which supported a verdict of not guilty by reason of insanity. This assignment of error, articulated in the original specifications of error, was neither briefed nor argued; therefore, it is considered abandoned. State v. Williams, 338 So.2d 672 (La.1976); State v. Domingue, 298 So.2d 723 (La.1974).

ASSIGNMENT OF ERROR NO. 4
In this assignment of error, the defendant argues that the trial court erred in imposing an excessive sentence. The trial judge imposed the maximum term of imprisonment, twenty-one years at hard labor, for the manslaughter conviction. LSA-R.S. 14:31. In addition, the trial judge imposed two more years as mandated by LSA-R.S. 14:95.2 for defendant's use of a firearm in the killing. The defendant claims that this sentence is excessive.
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in LSA-C.Cr. P. Art. 894.1, the goal of which is articulation of the factual basis for a sentence. The important elements which must be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981).
Second, the reviewing court must then determine whether the sentence imposed is too severe given the circumstances of the case and the background of the defendant. A sentence violates LSA-Const. Art. 1, § 20 (1974) if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Bonanno, 384 So.2d 355 (La. 1980). A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it is so disproportionate as to shock the sense of justice. State v. Barberousse, 480 So.2d 273 (La.1985). The trial judge has wide discretion in the imposition of a sentence within the statutory limits and such a sentence should not be set aside as excessive absent a manifest abuse of discretion. State v. Square, 433 So.2d 104 (La.1983). As a general rule, maximum sentences are appropriate only in cases involving the most serious violation of the offense and the worst type of offender.
Regarding the trial court's adherence to statutory sentencing guidelines, appellate counsel acknowledges that the trial judge *265 stated for the record all relevant considerations and factual bases for sentencing. The record speaks for itself on this issue, and the first prong of the two-pronged review is well satisfied.
If the trial judge has complied with LSA-C.Cr.P. Art. 894.1, the reviewing court should not set aside the sentence as excessive in the absence of a clear abuse of the wide discretion accorded a trial judge in the imposition of sentences within statutory limits. State v. Hunter, 441 So.2d 434 (La.App. 2d Cir.1983), writ denied sub nom., State v. Mayweather, 444 So.2d 1239 (La.1984). The factors that are to be considered in determining whether there has been an abuse of discretion are (1) the nature of the crime, (2) the nature and the background of the offender, and (3) the sentences imposed for similar crimes by the same court or other courts. State v. Hunter, supra.
Appellate counsel stresses defendant's emotional state and his expression of remorse. These are mitigating factors, counsel argues, and the trial court abused its discretion by imposing the maximum sentence, which is "grossly out of proportion to the severity of the crime." Yet, appellant's argument addresses only one factor mentioned by Hunter, supra, and that is the nature and background of the offender. The other two factors are equally important.
At sentencing, the trial judge declared that "this is without question one of the saddest set of circumstances that I have confronted in my career. The impact and effect from it will continue to be felt by the victim's family and friends, by Mr. Hahn's family and friends, by Mr. Hahn himself...." Other remarks by the trial court showed that it considered the crime to be extremely serious and tragic, with continuing effects.
From that standpoint, the maximum sentence appears to be warranted, and a survey of jurisprudence bears out that conclusion. A Supreme Court, a Second Circuit and two First Circuit cases are particularly relevant: State v. Crawford, 410 So.2d 1076 (La.1982); State v. Freeman, 521 So. 2d 783 (La.App. 2d Cir.1988); State v. Mathews, 428 So.2d 988 (La.App. 1st Cir. 1983); and State v. Heath, 447 So.2d 570 (La.App. 1st Cir.1984), writ denied, 448 So. 2d 1302 (La.1984). In these cases, all four defendants were charged with second degree murder, but were found guilty of manslaughter. All were sentenced to the maximum, 21 years at hard labor; all protested their sentences; and all sentences were affirmed.
Upholding the Crawford sentence, the Louisiana Supreme Court approvingly noted the trial judge's observation that the jury "had granted defendant all of the compassion she was entitled to by returning a verdict of manslaughter instead of the charged offense of second degree murder. The court obviously considered that any lesser sentence would deprecate the seriousness of the offense under the circumstances." State v. Crawford, supra, at 1079.
In State v. Freeman, the defendant knocked the victim's grandfather to the ground and walked away. The victim, a deaf and dumb youth, approached the defendant and tapped her on the shoulder. The defendant then fatally stabbed the youth. Although she was charged with second degree murder, she was convicted of manslaughter and sentenced to the maximum term of 21 years. In upholding the sentence we concluded that the facts of this case indicated that defendant's offense was actually second degree murder rather than manslaughter. We thus determined that the idea that maximum sentences could only be imposed for the most serious violation and the worst type of offender was not applicable. State v. Freeman, supra.
In State v. Mathews, the angry defendant, who had on previous occasions battered his estranged wife, was provoked by jealousy and shot her at close range. The First Circuit quoted from State v. Jones, 398 So.2d 1049 (La.1981), in which the Louisiana Supreme Court said that maximum sentences are appropriately imposed in cases involving the most serious violations and the worst kind of offender. In the *266 First Circuit's view, the instant facts did involve "the most serious violation of the offense of manslaughter, and consequently the trial judge's imposition of the maximum sentence is justified." State v. Mathews, supra, at 990.
In State v. Heath, the defendant pled not guilty and not guilty by reason of insanity. A jury found him guilty of manslaughter. The trial judge provided thorough reasons for sentencing him to the maximum term of 21 years. The appellate court found that this sentence was not so grossly disproportionate to the crime as to shock their sense of justice. Although the defendant was a first offender and the evidence showed that he suffered from emotional problems, he committed the killing without provocation.
While none of the facts of the aforesaid cases are precisely on point with the instant facts, it is clear that the manslaughter verdict in each case did not describe the true legal circumstances. In each of these cases, just as in the instant case, it appears that a strong argument can be made that the offense actually committed was second degree murder and that the factfinder acted with compassion in returning a verdict of manslaughter. Just as in State v. Freeman, supra, we observe that under these circumstances the maximum sentence may be appropriate.[3] Considering the circumstances of this offense, we cannot say that the sentence imposed is grossly out of proportion to the severity of the crime or is a needless imposition of pain and suffering. This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 5
In this assignment of error, the defendant urges the court to review the entire record for errors "patent on the face of the record" which are discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence. LSA-C.Cr.P. Art. 920; State v. Martin, 329 So.2d 688 (La.1976).
This court finds no errors patent on the face of this record. This assignment of error is without merit.
For the foregoing reasons, the defendant's conviction and sentences are affirmed.
AFFIRMED.

ON APPLICATION FOR REHEARING
Before MARVIN, JASPER E. JONES, FRED W. JONES, Jr., SEXTON and NORRIS, JJ.
Rehearing denied.
NOTES
[1] Defendant's Assignment of Error No. 1 asserts the trial court erred by denying the defendant's "Pretrial Motion to Suppress Statements." That motion sought to suppress both the oral and recorded statements given in the hospital room and a subsequent statement which the defendant made in open court at the time of his arraignment. The statement made at arraignment was suppressed by the trial court and thus is not at issue here.

In brief the defendant does not specifically complain about the circumstances under which the oral statement was given. However, since the statements were closely attenuated in time, his arguments with respect to the recorded statement are equally pertinent to the original statement. Thus our decision under this assignment applies to both statements.
[2] At the trial, however, Dr. Vigen testified that the defendant did not have the ability to understand and waive his Miranda rights.
[3] The concept that a maximum sentence can only be imposed for the most serious violation by the worst type of offender is difficult to apply in manslaughter cases in the sense that the maximum sentence of 21 years seems relatively light when compared to the loss of human life and to the maximum sentences for many other offenses.