Judgment rendered November 15, 2023.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 55,314-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

LOGAN SMITH                                 Appellant

* * * * *

Appealed from the
Twenty-Sixth Judicial District Court for the
Parish of Webster, Louisiana
Trial Court No. 95870

Honorable Charles A. Smith, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Douglas Lee Harville

LOGAN SMITH                          Pro Se

J. SCHUYLER MARVIN                   Counsel for Appellee
District Attorney

RICHARD RUSSELL RAY
MARCUS RAY PATILLO
JIMMY WAYNE "JIMBO" YOCOM, JR.
Assistant District Attorneys

* * * * *

Before PITMAN, HUNTER, and MARCOTTE, JJ.

**HUNTER, J**.

Defendant, Logan Smith, was charged by bill of indictment with second degree murder, in violation of La. R.S. 14:30.1. Following a trial, a unanimous jury found defendant guilty as charged. He was sentenced to serve life in prison without the benefit of parole, probation, or suspension of sentence. For the following reasons, we affirm.

## FACTS

Glennis McCotter last saw her son, Anthony Bruns, in Springhill, Louisiana, on June 19, 2020, between 11:15 a.m. and 12:00 p.m. Later that evening, at approximately 6:45 p.m., Derrick Gavin was driving on Percy Burns Road in Webster Parish, near the Louisiana-Arkansas state line, when he noticed a "human laying on the side" of the eastbound shoulder of the road. The body was later identified as Anthony Bruns, who had sustained a single gunshot wound to the back of the head.[1]

A house located near the location of Bruns' body had a security camera system. The camera captured a video depicting a Ford F-150 pickup truck driving on Percy Burns Road. It was later determined Ronald Aycock was the owner of the truck; Aycock is the grandfather of Abbett Echols.

Later that day, witnesses saw defendant and Echols on some property in Taylor, Arkansas.[2] The property was owned by Allen Dawson, defendant's stepfather. According to witnesses, defendant and Echols were

---

[1] During the trial, Major Phillip Krouse testified the identity of the victim was unknown when the body was initially discovered. He stated the victim had a tattoo of the name, "Bruns," on his leg. According to Maj. Krouse, he obtained a tentative identity by taking a photograph of the tattoo and running the name through a computer database. Once the officer ascertained the victim's name, his photograph was generated, and they were able to locate his family.

[2] Taylor, Arkansas is located near the Louisiana-Arkansas border.

on the Dawson property attempting to burn some items, including carpet and rubber mats. At the direction of Allen Dawson, defendant placed the items in a "junk car" on the property. One witness testified defendant and Echols had removed the seats from the Ford F-150 pickup truck.

The following day, June 20, 2020, Jerry Brown drove defendant's mother to Shreveport, Louisiana to pick up defendant, who claimed to have abandoned Aycock's pickup truck due to a flat tire. During an interview with law enforcement officers, Brown stated defendant told him he (defendant) and Echols had "shot somebody." According to Brown, defendant did not display any emotion when he made the statement, and defendant told him he felt "relief" after he shot the person.

Chad Dawson, defendant's stepbrother, also contacted the Webster Parish Sheriff's Office ("WPSO") on June 20, 2020, and reported he was in possession of a firearm which was possibly connected to the murder of Bruns. Major Philip Krouse, a detective in charge of criminal investigations and narcotics for the WPSO, met Chad at a church in Taylor, Arkansas. Chad gave Maj. Krouse a .357 Magnum firearm and told him he had purchased the firearm from Echols. Bullet fragments recovered from Bruns' body matched a bullet test-fired from the .357 Magnum.

Subsequently, Maj. Krouse went to the property owned by Dawson. After speaking with Dawson, the officers walked around the property and detected "an odor of decomposition." The officers lifted a mattress on the back of an abandoned pickup truck and recovered two floor mats, a blood-soaked red bath towel, carpet, insulation from carpet, a cell phone, and

2

Bruns' missing shoe.[3] Bruns' DNA was obtained from the cell phone, bath towel, carpet, and shoe.

On the night of June 20, 2020, defendant was apprehended at his stepfather's property and transported to the Springhill Police Department. Defendant was advised of his *Miranda* rights and signed a waiver of rights form. However, the interview was not recorded. The police officers decided to detain defendant because he had a warrant for his arrest on an unrelated matter. Thereafter, defendant was transported to the WPSO, where he was readvised of his *Miranda* rights and signed another waiver of rights form. During the interview, defendant confessed to shooting Bruns.

On June 21, 2020, the deputies from the WPSO went to Shreveport and recovered the Ford F-150 owned by Echols' grandfather. An examination of the truck revealed the carpet had been removed from the truck, and the missing carpet was consistent with the carpet found in the truck on the property of defendant's stepfather. Law enforcement officers ascertained Bruns was likely inside the truck when he was shot.

On July 27, 2020, defendant was charged by bill of indictment with second degree murder, in violation of La. R.S. 14:30.1. On August 1, 2022, defendant filed a motion to suppress his confession. On August 8, 2022, the trial court conducted a free and voluntary hearing and determined defendant's post-*Miranda* statements had been made freely and voluntarily and were, therefore, admissible.

---

[3] The victim was wearing one Levi Strauss house shoe when his body was discovered; the other shoe was not found at the scene.

Following a trial, a unanimous jury found defendant guilty as charged of second-degree murder. He was sentenced to serve life in prison without the benefit of parole, probation, or suspension of sentence.

Defendant appeals.

## DISCUSSION

Defendant contends the evidence was insufficient to prove, beyond a reasonable doubt, he was the person who killed Bruns. Although defendant admitted to shooting Bruns, he also erroneously stated Bruns had been shot twice – once by him and once by Echols. However, the statement is contradicted by the physical evidence which established Bruns sustained only one gunshot wound.

Further, defendant maintains Echols lied to law enforcement officers about his involvement in the crime; Echols was driving his grandfather's truck on the day of the murder; Echols sold the murder weapon; and Echols was behaving strangely after the murder. Defendant asserts it is reasonable to believe Echols committed the murder, framed defendant because of his "known mental health issues," went to Allen Dawson's property to burn the incriminating evidence and to sell the murder weapon, and later "hid" the truck in Shreveport.

When a defendant challenges both the sufficiency of the evidence to convict and one or more trial errors, the reviewing court first reviews sufficiency, as a failure to satisfy the sufficiency standard will moot the trial errors. *State v. Hearold*, 603 So. 2d 731 (La. 1992); *State v. Patterson*, 50,305 (La. App. 2 Cir. 11/18/15), 184 So. 3d 739, *writ denied*, 15-2333 (La. 3/24/16), 190 So. 3d 1190.

The standard of appellate review for a sufficiency of the evidence claim in a criminal case is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Burch*, 52,247 (La. App. 2 Cir. 11/14/18), 259 So. 3d 1190.

The *Jackson* standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. *State v. Sutton*, 436 So. 2d 471 (La. 1983); *State v. Norman*, 51,258 (La. App. 2 Cir. 5/17/17), 222 So. 3d 96, *writ denied*, 17-1152 (La. 4/20/18), 240 So. 3d 926.

Direct evidence provides proof of the existence of a fact, for example, a witness's testimony that he saw or heard something. *State v. Lilly*, 468 So.

5

2d 1154 (La. 1985); *State v. Baker*, 49,175 (La. App. 2 Cir. 8/27/14), 148 So. 3d 217. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *State v. Broome*, 49,004 (La. App. 2 Cir. 4/9/14), 136 So. 3d 979, *writ denied*, 14-0990 (La. 1/16/15), 157 So. 3d 1127. For a case resting essentially upon circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; *State v. Christopher*, 50,943 (La. App. 2 Cir. 11/16/16), 209 So. 3d 255, *writ denied*, 16-2187 (La. 9/6/17), 224 So. 3d 985.

The appellate court does not assess the credibility of witnesses or reweigh evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442; *State v. Walker*, 51,217 (La. App. 2 Cir. 5/17/17), 221 So. 3d 951, *writ denied*, 17-1101 (La. 6/1/18), 243 So. 3d 1064. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Ward*, 50,872 (La. App. 2 Cir. 11/16/16), 209 So. 3d 228, *writ denied*, 17-0164 (La. 9/22/17), 227 So. 3d 827.

In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Hust*, 51,015 (La. App. 2 Cir. 1/11/17), 214 So. 3d 174, *writ denied*, 17-0352 (La. 11/17/17), 229 So. 3d 928. The trier of fact is charged to make a credibility evaluation and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that

discretion only to the extent necessary to guarantee the fundamental due process of law. *State v. Sosa*, 05-0213 (La. 1/19/06), 921 So. 2d 94; *State v. Hust*, *supra*. A reviewing court accords great deference to a fact finder's decision to accept or reject the testimony of a witness in whole or in part. *State v. Brown*, 51,352 (La. App. 2 Cir. 5/2/17), 223 So. 3d 88, *writ denied*, 17-1154 (La. 5/11/18), 241 So. 3d 1013.

Second degree murder is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1(A)(1).

This is a circumstantial evidence case. Maj. Krouse testified he was notified of the discovery of a body on the side of a road on June 19, 2020. He stated he went to the scene and observed the victim had "a gunshot wound to the back of his head approximately two inches behind his left ear." Maj. Krouse also noticed the victim was wearing one Levi Strauss house shoe; the other shoe was missing. At that time, law enforcement officers did not know the identity of the shooter. Subsequently, defendant was developed as a suspect after his stepbrother, Chad Dawson, came forward the following day. Maj. Krouse stated Chad was in possession of a firearm and informed him defendant had hidden the weapon "on the property," he was "scared of the way [defendant] had been acting over the last few days," and he was concerned the firearm had been used in the murder.[4]

---

[4] During the trial, Chad Dawson testified on the day of the murder, he saw defendant and Echols riding in the truck owned by Echols' grandfather; Echols was driving, and defendant was riding in the back seat. Chad also testified he noticed the driver's seat, passenger seat, and back seat were "out," and the front seat was "totally removed." He also stated he was told "they" were hiding a .357 Magnum handgun. According to Chad, he purchased the gun from Echols because he did not want defendant to have possession of a firearm, due, in part, to his volatile relationship with his (Chad's) father.

Maj. Krouse testified he and other officers went to defendant's residence at approximately 11:30 p.m. and encountered Allen Dawson. Dawson told the detective defendant, Echols, and an unknown black male came to his property between 5:00 p.m. and 7:00 p.m. to "clean out" a truck; however, defendant refused to allow Dawson to approach the truck. Dawson also stated defendant and Echols had asked to burn some carpet and rubber floor mats in his burn barrel. Dawson testified defendant placed the items in one of the vehicles in the salvage yard on his property.

After listening to Dawson's statements, the law enforcement officers began looking around the property and soon detected the odor of "real bad decomposition." Maj. Krouse stated he looked into the back of one of the trucks and saw an old mattress; he lifted the mattress and saw what appeared to be bloody carpet and the victim's other shoe. He testified he called the law enforcement agency in Columbia County, Arkansas, to process the scene and collect the evidence.[5]

Prior to taking defendant into custody, Maj. Krouse also interviewed Jerry Paul Brown, who stated he saw defendant and another man on Allen Dawson's property on June 19, 2020. Brown also asserted he overheard Dawson "fussing at" defendant and the unidentified man "about wanting to burn rubber mats in a burn barrel." As stated above, Brown drove defendant's mother to Shreveport to pick defendant up, and during the drive back to Arkansas, defendant told him he had "shot someone," and he "felt

_____

[5] The officers collected bloody carpet, carpet insulation, two floormats, bloody red towels, a cell phone, and a Levi Strauss house shoe.

8

relieved" after he did so. Defendant also told Brown Echols had also shot the person.

Days after defendant's arrest, police officers went to Shreveport to retrieve the truck they believed defendant had driven to Shreveport. They discovered the carpet was missing from the floorboard on the front passenger side and the front center of the vehicle. Maj. Krouse testified the carpet found at defendant's residence matched the carpet in the truck.

Furthermore, during the trial, Alma Pickard, the mother of Chad Dawson's girlfriend, testified on the day of the murder, defendant came to her house.[6] She described defendant's demeanor as "nervous or scared," and stated he was "looking down and fiddling." Pickard testified after defendant left, she noticed "some slide shoes" next to her swimming pool, and she noticed blood on the shoes.

Shelby Pickard, Chad's girlfriend, testified she went to her mother's house and retrieved a "mismatched" pair of "Nike slides" "a day or two" after she heard about the murder. She stated her mother had heard about the murder and wanted her to turn the shoes over to the authorities "because they didn't want no dealings with anything." Shelby testified she picked up the shoes and turned them over to law enforcement officers.

On June 20, 2020, defendant agreed to accompany the officers from Taylor, Arkansas, to Springhill, Louisiana. Maj. Krouse testified he advised defendant of his *Miranda* rights, and defendant initially denied knowing the victim or anything about the homicide. Hours later, during a second interview, defendant initially stated he did not know the victim, and he did

---

[6] Pickard lived in Louisiana, "very close" to the Arkansas state line.

9

not know anything about the items discovered on his stepfather's property. After additional questioning, defendant confessed to shooting the victim.

Katie Traweek, a forensic deoxyribonucleic acid ("DNA") analyst at the North Louisiana Crime Lab, testified as an expert in forensic DNA analysis. She stated she analyzed the Smith & Wesson handgun, a house shoe, three towels with suspected blood, two cell phones with suspected blood, a pair of shorts with suspected blood, a tank top with suspected blood, several swabs of suspected blood, and Nike slides with suspected blood.

Traweek testified the blood on one of the cell phones, towels, and carpet contained the victim's DNA. The DNA on the house shoe was consistent with three people; the victim was a major contributor of the DNA obtained from the inside of the shoe. Traweek also testified she tested the DNA obtained from a pair of Nike slides, and the blood on the slides contained the victim's DNA. Additionally, the DNA derived from the inside of the shoes "was a mixture of at least two people"; however, there was not enough DNA in the specimen to include or exclude anyone as the contributor. Further, Traweek testified defendant's DNA was found on his belongings – one of the cell phones, the tank top, and the pair of shorts. The victim's blood was not found on any of defendant's items.

Philip Stout, a firearm section supervisor at the North Louisiana Crime lab, was accepted by the trial court as an expert in firearm identification. Stout testified he analyzed a bullet and the firearm in this

case, and the "bullet jacket and bullet jacket fragment were identified as being fired from the revolver."[7]

The jury was also provided with defendant's interview with law enforcement officers. During the interview, defendant related to the officers he shot the victim.

The totality of the evidence presented was sufficient to establish defendant shot the victim with the intent to kill or inflict great bodily harm. As evidenced by defendant's conviction, the jury ultimately determined the witnesses' testimony was credible. The defendant was developed as a suspect in the murder within hours of the body being discovered. As noted above, witnesses testified defendant had been seen placing items on his stepfather's property, including bloody carpet, bloody towels, the victim's shoe, and the victim's cell phone. Further, the jury could have reasonably rejected defendant's claim someone else, namely Echols, killed the victim. This assignment of error is without merit.

Defendant also contends the evidence was insufficient to establish the murder occurred in Louisiana. He argues the evidence established Bruns was not killed on the side of the road where his body was discovered. Based on the physical evidence, Bruns was likely killed in Echols' truck. Defendant maintains he and his family lived in Arkansas; therefore, it is reasonable to assume *if* he killed Bruns, he did so in Arkansas and merely dumped the body in Louisiana. Therefore, according to defendant, the State

---

[7] Dr. Frank Peretti, an expert in the field of forensic pathology, testified he performed an autopsy on the victim's body on June 21, 2020. Dr. Peretti testified that the victim died as a result of a single gunshot wound to the head. He stated he recovered "multiple pieces of the core and jacket" of the bullet from the victim's body and sent the items to the coroner's office.

failed to prove, beyond a reasonable doubt, the murder was committed in Louisiana. Consequently, his conviction and sentence should be vacated, and a judgment of acquittal should be entered.

In response, the State argues this assignment of error is not properly before this Court because defendant did not file a motion to quash the bill of indictment or make any objections thereto.

Every person charged with a crime is entitled to a speedy, public, and impartial trial in the parish where the offense or an element of the offense occurred, unless venue is changed in accordance with law. La. Const. art. I, § 16. La. C. Cr. P. art. 611 governs the jurisdiction and venue of criminal trials and provides, in pertinent part:

> A. All trials shall take place in the parish where the offense has been committed, unless the venue is changed. If acts constituting an offense or if the elements of an offense occurred in more than one place, in or out of the parish or state, the offense is deemed to have been committed in any parish in this state in which any such act or element occurred.
> B. If the offender is charged with any criminal homicide enumerated in R.S. 14:29 or any other crime involving the death of a human being and it cannot be determined where the offense or the elements of the offense occurred, the offense is deemed to have been committed in the parish where the body of the victim was found.
>                                     ***
> Venue is not an essential element of the offense; rather, it is a

jurisdictional matter. *See* La. C. Cr. P. arts. 611A and 615. Objections to venue must be raised by a motion to quash to be ruled on by the court in advance of the trial. *State v. Brooks*, 20-0454 (La. App. 1 Cir. 2/19/21), 320 So. 3d 419; *State v. Ford*, 17-0471 (La. App. 1 Cir. 9/27/17), 232 So. 3d 576, *writ denied*, 17-1901 (La. 4/22/19), 268 So. 3d 295.

The general rule is that appellate courts will not consider issues raised for the first time on appeal. *State v. Revish*, 19-01732 (La. 10/1/20), 340 So.

12

3d 864, *citing Segura v. Frank*, 630 So. 2d 714, 725 (La. 1994). An exception exists to the general rule when the successful proponent of a motion to suppress in the district court offers *additional reasons* a reviewing court should sustain the district court's ruling, which reasons can be evaluated by the reviewing court without venturing beyond the record. *See State v. Butler*, 12-2359 (La. 5/17/13), 117 So. 3d 87.

Defendant did not object to venue by filing a motion to quash in advance of trial. Therefore, defendant's alleged error is not properly before us for review.

Defendant further contends the trial court erred in finding his statements to law enforcement officers were free and voluntary. He argues he "was in an extremely disturbed mental state" when he confessed to shooting Bruns, and witnesses stated he was "not acting like himself" on the day of the murder. Defendant asserts he was "awakened and taken from his Arkansas home to a Louisiana jail in the middle of the night." Further, defendant argues Maj. Krouse implied if he did not confess, his mother and other family members might be arrested. According to defendant, under these circumstances, his *Miranda* waiver and subsequent confession were not knowing and voluntary, and his conviction must be reversed and his sentence vacated.

In *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the United States Supreme Court held the prosecution may not introduce at trial a statement stemming from *custodial interrogation* of a defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *Miranda* applies when a

person is questioned (*i.e.*, interrogated) by law enforcement while in police custody (or otherwise deprived of his freedom of action in any significant way).

A confession is involuntary, and therefore inadmissible, if it is obtained by "techniques and methods offensive to due process, or under circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will.'" *Oregon v. Elstad,* 470 U.S. 298, 304, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985); *U.S. v. Ortiz*, 943 F. Supp. 2d 447, 456 (S.D.N.Y. 2013).

As a general matter, before inculpatory statements may be admitted into evidence, the State has the burden of affirmatively showing they were made freely and voluntarily and not the influence of fear, duress, intimidation, menace, threats, inducements or promises. La. R.S. 15:451; La. C. Cr. P. art. 703(D); *State v. Holliday*, 17-01921 (La. 1/29/20), 340 So. 3d 648, *cert. denied*, 141 S. Ct. 1271, 209 L. Ed. 2d 10 (2021). The question of voluntariness of a confession, including a determination of the defendant's state of mind, must be resolved from the facts and circumstances of the particular case. *State v. Demming*, 40,033 (La. App. 2 Cir. 9/21/05), 911 So. 2d 894; *State v. Hahn,* 526 So. 2d 260 (La. App. 2 Cir. 1988), *writ denied*, 532 So. 2d 150 (La. 1988). Voluntariness is determined on a case-by-case basis, under a totality of the circumstances standard. *State v. Garner*, 52,047 (La. App. 2 Cir. 6/27/18), 250 So. 3d 1152, *writ denied*, 18-1290 (La. 2/25/19), 266 So. 3d 288; *State v. Demming*, *supra*.

A trial court's finding as to the free and voluntary nature of a statement carries great weight and will not be disturbed unless not supported

14

by the evidence. *State v. Benoit,* 440 So. 2d 129 (La. 1983); *State v. Richardson,* 33,272 (La. App. 2 Cir. 11/1/00), 779 So. 2d 771, *writ denied,* 00-3295 (La. 10/26/01), 799 So. 2d 1151. Credibility determinations lie within the sound discretion of the trial court and its rulings will not be disturbed unless clearly contrary to the evidence. *State v. Vessell,* 450 So. 2d 938 (La. 1984).

The transcript of the defendant's interview with law enforcement was introduced into evidence. The colloquy was as follows:

***

[SGT. KEMP]: [W]e had a conversation with [your mother and stepfather] for a little while. And we found some – some things at the house such as some bloody carpet that came out of a vehicle and the right house shoe that we were looking for and some bloody floor mats and some bloody blue jeans and three bloody red towels. Does any of that sound familiar to you?

[DEFENDANT]: No, sir.

[SGT. KEMP]: Well, I guess then, I guess in order to shift gears and since your memory seems to be extremely short, we've got statements saying that you put that stuff in there. And we're gonna send it all up to the crime lab and get it – you know, have a blood comparison done that's probably we think is gonna belong to this fellow in the picture that you say you don't know.

[DEFENDANT]: Yeah.

[MAJ. KROUSE]: And we also have the truck in our possession with the carpet tore out of it, okay?

[DEFENDANT]: Yeah.

[MAJ. KROUSE]: You still don't know nothing about it?

[DEFENDANT]: No, sir.

[MAJ. KROUSE]: Okay. So, our next step now is, is to arrest your mother, arrest your stepfather, and arrest the other gentleman that's in the house 'cause that's the only way any of this is gonna happen because you know nothing about it –

15

[SGT. KEMP]:  And it's at their house.

[MAJ. KROUSE]:  - it's at their house.

[DEFENDANT]:  They ain't taking my mama to jail so –

[MAJ. KROUSE]:  Well, here's the –

[DEFENDANT]:  Well, I did the sh*t then.  Let's go.  Take me to –

[MAJ. KROUSE]: *** Sit down.

[DEFENDANT]:  Just don't take my mama to jail.  My mama's sick. No, she's gonna die.

[MAJ. KROUSE]: Well, here's the thing.

[DEFENDANT]: She can't.
*** 
[MAJ. KROUSE]:  You just need to tell the truth, because we have no choice.  It's on the property.

[DEFENDANT]: I know that.

[MAJ. KROUSE]:  If you don't know nothing about it –

[DEFENDANT]:  Look, if it's on the property, I'll take the lick for it, dude.

[MAJ. KROUSE]:  We – we just want to know the truth.

[DEFENDANT]:  I shot that motherfu*ker.
*** 
[MAJ. KROUSE]:  Why did you shoot him?

[DEFENDANT]:  Because man, the fu*king devil's been on me.  I been going through it, y'all.  I been having hell the last three months of my life, dude.  And I don't know man, I don't know.
*** 

During the trial, when questioned about defendant's interview, Maj.

Krouse testified as follows:

We explained to [defendant] what we had found on the Dawsons' property, [he] stated he did not know anything about that.  It's 3 o'clock in the morning, we're getting tired, we had found bloody carpet, we had found bloody items, it was no

16

threats by no means. It's just somebody on that property knew something about this crime. So, at this point, I told Mr. Smith that we would need, at this point, everyone there is going to go to jail because we have to figure out what happened to Mr. Bruns.

***

In *U.S. v. Hufstetler*, 782 F. 3d 19 (1st Cir. 2015), *cert. denied*, 577 U.S. 884, 136 S. Ct. 191, 193 L. Ed. 2d 151 (2015), the defendant challenged his conviction, arguing he was coerced into confessing. At the time of the defendant's confession, his girlfriend had also been taken into custody, and a substantial portion of the defendant's interview dealt with his girlfriend's prospects for release. Prior to the interview, law enforcement officers had obtained photographs from the bank video depicting the defendant, and they had interviewed witnesses who had seen the defendant and his girlfriend sitting in a car and driving around the bank prior to the robbery. At several points during the interview, the officers referred to the evidence and noted the purpose of the interrogation was, in part, to determine the girlfriend's role in the robbery. One officer stated, "This is your opportunity to explain to us what her role is." Another officer asked, "[W]as she there on her own accord or did she not know what was going on?" In an attempt to spare his girlfriend, the defendant confessed, taking full responsibility for the robbery. He later appealed, arguing his confession was not free and voluntary. The court reviewed cases in which law enforcement officers used threats to a family member as a tool, noting "One cluster of cases implies that the use of a family member uniquely tugs at a suspect's emotions and thus can have an undue impact." 782 F. 3d at 22. The court further noted, "At a minimum, these cases illustrate that we must be on alert when an officer utilizes a family member as a tool during an

17

interrogation." 782 F. 3d at 23. The court concluded the defendant's confession was voluntary, stating:

> [W]e can discern no improper threat or promise. At the outset, we note that the officers had probable cause to hold [the defendant's girlfriend]. In such a circumstance where the referenced relative is both a family member and a co-suspect, probable cause for holding that individual helps to place the officers' statements in context. Without more, an officer's truthful description of the family member's predicament is permissible since it merely constitutes an attempt to both accurately depict the situation to the suspect and to elicit more information about the family member's culpability.
>
> ***
>
> In context, it is difficult to view the officers' actions, in their totality, as improper. The officers' statements were undoubtedly difficult for [the defendant] to swallow, and the officers were clearly aware that [the defendant] was in a rough spot. But, they never lied, exaggerated the situation, or conditioned either individual's release on [the defendant's] willingness to speak. Instead, they told [the defendant] that [his girlfriend] was a suspect and unless new information came to light to discount her culpability she would continue to be criminally liable. We take no issue with the officers' utilization of this indisputably true fact to both gain more information about [the girlfriend] and to elicit more intelligence about [the defendant's] own actions.

782 F. 3d at 23. The court noted the defendant's age, education, intelligence, and mental condition, and found he was not susceptible to the alleged illegal police conduct.

In *U.S. v. Ortiz*, *supra*, the defendant sought to suppress the statements he made to police officers following the discovery of an illegal gun in the apartment he shared with his mother and elderly aunt. The defendant argued the officers' threat to arrest everyone in the apartment, including his mother and aunt, in connection with the gun coerced him into confessing his ownership of the gun. The court reviewed the evidence and concluded the officers' threat to arrest the defendant's mother and aunt "was

18

improper unless the police had probable cause to arrest those individuals and thus could lawfully act on the threat." The court stated:

> A reasonable officer could not have concluded that there was probable cause to arrest [the mother and aunt] for constructive possession of the gun. [The officer] therefore had no basis for threatening to arrest either [the mother or the aunt] and so his threat to do so was sufficiently overreaching as to warrant suppression of Defendant's self-incriminating statements[.]

*Id.* at 458.

In *State v. McClain*, 12-1766 (La. App. 1 Cir. 6/7/13), *writ denied*, 13-1637 (La. 1/27/14), 131 So. 3d 53, law enforcement officers executed a search warrant at a residence and recovered large amounts of powdered cocaine and crack cocaine from various rooms in the residence. The defendant lived at the residence with his mother. The defendant sought to suppress his statement to police officers, arguing he made the statement in response to an officer's alleged threat to arrest his mother if he did not confess to owning the drugs. The police officer admitted to telling the defendant it was a possibility his mother would be arrested if he did not agree to an interview with law enforcement. The trial court denied the defendant's motion to suppress, and the court of appeal affirmed, stating:

> In finding defendant's statement at the residence to be freely and voluntarily given, the trial judge opined that as one of the several occupants of the residence where drugs were found, it was a possibility that defendant's mother would be arrested. Therefore, she found that [the police officer's] statements to defendant and his mother about the possibility of her arrest were not threats, but statements of fact.
> ***
> After a careful review of the record, we find that the district court did not abuse its discretion in denying the motion to suppress defendant's statement. The testimony at the hearing on the motion to suppress and at trial, in addition to the videotaped recording of defendant's statement, clearly establish that defendant was advised of his *Miranda* rights and that he executed a knowing and intelligent waiver of those rights. [The

police officer's] testimony at the hearing, which the district court found to be credible, showed that defendant appeared to understand his rights. The district court also found credible [the police officer's] testimony that he did not coerce or threaten defendant into implicating himself in order to exonerate his mother. Although defendant may have had a genuine concern for the welfare of his mother, it is evident that he was in no way coerced into incriminating himself in order to exonerate her. The test for voluntariness of a confession requires a review of the totality of the circumstances under which the statement was given. We conclude, as did the district court, that under a totality of the circumstances, defendant's confession was voluntary. Therefore, the trial court did not err or abuse its discretion in denying the motion to suppress his statement.

*Id*. at 3 (internal citations omitted).

In *State v. Brown*, 504 So. 2d 1025 (La. App. 1 Cir.), *writ denied*, 507 So. 2d 225 (La. 1987), police officers stopped a stolen vehicle and arrested the two female occupants. One of the females was the defendant's sister, and the other was his girlfriend. The defendant alleged his statements to law enforcement officers were obtained by promises that his girlfriend and sister would be released only if he confessed. The trial court found the police officers' statements did not constitute inducements or promises and ruled the defendant's confession was admissible. The court of appeal affirmed, stating, "Although defendant may have had a genuine concern for the welfare of his sister and girlfriend, it is evident that he was in no way coerced into incriminating himself in order to corroborate the women's claim of innocence." *Id*. at 1031.

In the case *sub judice*, in denying defendant's motion to suppress the confession, the trial court stated:

*** I watched the video, and frankly, I considered what Major Krouse said to him just a practical, "Well, you don't know anything about it; this is what we have to do next." I did not consider that a threat or coercion. Now, his reaction to it and what he thought out it may have been, but I could tell nothing

20

from my viewing of it and listening to it that the officer was doing anything more than saying this is the next logical step. His reaction was different[.] *** [T]he defense will be able to argue regarding, well, what weight should be given to it by the jury based on the totality of the circumstances, but I do not find the circumstances to have been such that it would violate the defendant's rights, and therefore, the statement is admissible.

The testimony confirmed Maj. Krouse advised defendant of his *Miranda* rights, and defendant indicated he understood those rights by executing a written waiver of rights form. The record reveals defendant's mother and stepfather lived on the property where the evidence was discovered. The stark reality of the situation was a dead body had been discovered, and much of the evidence related to the murder had been discovered on the Dawson property. Due to the nature of the evidence (a bloody house shoe matching the one the victim was wearing, bloody carpet, and bloody floormats), the officers had a strong reason to suspect someone who resided on the property either committed the murder or knew the identity of the person who committed the murder. Maj. Krouse's statement to defendant (regarding the possible arrest of other family members) provided information regarding the next possible steps in the investigation. The statement revealed the gravity of the situation and was not exaggerated or improper. A review of the totality of the circumstances under which defendant confessed does not clearly establish defendant was coerced into incriminating himself. Accordingly, we find the trial court did not err in concluding defendant's confession was voluntary and, therefore, admissible.

We have reviewed this record for errors patent. We have found none.

## CONCLUSION

For the reasons set forth herein, defendant's conviction and sentence are hereby affirmed.

**CONVICTION AFFIRMED; SENTENCE AFFIRMED.**